## THE C. W. CRANE.

### C. W. CRANE CO., Inc., etc., v. EVANS TRANSP. CORPORATION et al.

### UNITED STATES COMMERCIAL CO. v. SAME.

#### No. 301.

Circuit Court of Appeals, Second Circuit.
June 7, 1946.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for C. W. Crane Co., Inc.

Forrest E. Single, of New York City, for Evans Transp. Corporation.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for Seaboard Great Lakes Corporation.

Paul P. Brennan, of New York City, for M. J. Rudolph Co., Inc.

Horace T. Atkins, of New York City (William Weymar, Jr., of New York City, of counsel), for United States Commercial Co.

Before CHASE, CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

This appeal represents one more effort to induce us in an admiralty case to disregard the trial judge's findings of fact although supported by evidence, where the testimony is in conflict, and where he heard and saw most of the witnesses—something which we have repeatedly said we would not do.[1] We could, and probably should,

confine this opinion to a statement that the findings, as they are not clearly erroneous, must stand, and that the trial judge's conclusions of law are valid. However, we shall, in this instance, enlarge our discussion, hoping that thereby we can demonstrate to the bar the futility of such appeals.

The appeal is from a decree rendered in two actions, which were tried together, and consolidated for the purpose of appeal. In the first action the libel alleged that the respondent Evans Transportation Corporation[2] chartered the scow C. W. Crane[3] owned by the libellant, C. W. Crane Company, Inc., and returned the scow in badly damaged condition on September 29, 1943. Evans impleaded the Seaboard Great Lakes Corporation[4] on the ground that Seaboard had sub-chartered the same scow from Evans on September 27, 1943. Seaboard then impleaded M. J. Rudolph Company, Inc.,[5] stevedores, asserting that the cause of the disaster was improper loading. The court below held Seaboard primarily liable, and Evans secondarily liable. Rudolph was held to be without fault.

In the second libel, the United States Commercial Company asserted that the scow Crane, her owners, the charterer and sub-charterer, and the stevedores were jointly responsible for the loss of the cargo which had been put on the Crane, and was lost when the scow overturned. The libel against the Crane was in rem. In the cargo suit, Seaboard was held primarily liable for the loss and the scow C. W. Crane, secondarily liable in rem. The libel was dismissed as to the others.

On September 1, 1943, the Evans Corporation chartered the Crane for an indefinite period, the charter to include the services of the scow-captain. The Crane was thoroughly inspected inside and out by the Superintendent of the Crane Company on August 28, 1943, and there is no showing

---

[1] See, e. g., Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992; Kulukundis Shipping Co. v. Amtorg Trading Co., 2 Cir., 126 F.2d 978; Matton Oil Transfer Corp. v. The Dynamic, 2 Cir., 123 F.2d 999; James Richardson & Sons v. Conners Marine Co., 2 Cir., 141 F.2d 226; Seaboard Sand & Gravel Corporation v. American Stevedores, Inc., 2 Cir., 151 F.2d 846; F. E. Grauwiller Transportation Co. Inc. v. Gallagher Bros. Sand & Gravel Corp., 2 Cir., 153 F.2d 384.

[2] Hereafter referred to as Evans.

[3] Hereafter referred to as Crane.

[4] Hereafter referred to as Seaboard.

[5] Hereafter referred to as Rudolph.

that she was put to unusual use in the interval of five days before she was turned over on charter to Evans. Previously, in January 1943, she had been completely overhauled in drydock. The finding by the trial judge that she was seaworthy on September 2, 1943, therefore seems justified. Cf. O'Boyle v. United States, 2 Cir., 47 F. 2d 585.

The Crane is a deck-scow with raked ends and cargo bulkheads on each end. She has a capacity of about 850 tons and is eleven or twelve years old. Between September 2 and September 27, the Crane made four trips, loaded with vehicles. The evidence is not clear as to the load she was carrying on these trips, but it probably never exceeded 300 tons. No difficulties were encountered on any of these trips. On September 27, Seaboard requested Evans to supply it with boats to remove cargo from the S. S. Harpalycus. On that day, a tug called the American Eagle, which was operated by Seaboard, picked up the Crane and another scow, the Metropolitan 150, and towed them to Pier 33 in Brooklyn where they were tied up alongside the Harpalycus. On September 28, the Crane was placed alongside the Harpalycus, starboard side to. Loading began that afternoon and was discontinued after about 150 tons of ore had been taken on. During the night the Crane began to grind against the Metropolitan 150 and the Harpalycus, due to the traffic in Buttermilk Channel, and the fact that Pier 33 where the Crane was lying is an exposed berth. As a result of the grinding, the Crane lost its fenders and the Metropolitan 150 sprang a leak.

On the morning of September 29, the Crane's bargee communicated with Seaboard and with Evans by telephone. He informed both that the Crane was in a bad spot, and should be moved, and that Metropolitan 150 was leaking. The Crane was moved forward to the bow of the Harpalycus and loading was resumed. At about 5.45 p.m., after the scow had received between 400 and 500 tons of ore on board, the bargee discovered that she was leaking at the starboard stern corner. It was the starboard side of the Crane which had been alongside the Harpalycus the night before when the grinding had taken place, and the starboard side remained alongside the Harpalycus during the day.

The Crane's bargee attempted immediately to control the leak by caulking it with oakum. He borrowed additional oakum for this purpose from the Metropolitan 150. He made no attempt to use the crane's pumps. The trial judge found that under the circumstances this was not negligence, and we agree, for there would probably have been very little point in using the hand-pumps unless the leak could first be stopped.

After attempting vainly to caulk the leak, the bargee ordered the loading stopped and again called Seaboard, this time at about 6 p.m. He was informed that it would be impossible to get in touch with the American Eagle for about an hour. About forty-five minutes later, the tug arrived at the scene. Her master inspected the Crane and, although by this time the scow was listing to starboard, the siphon of the American Eagle was placed in the port stern corner. The siphon thus employed was not in working condition, a fact which was known to the master of the American Eagle who had previously that afternoon attempted to use it in aid of the Metropolitan 150 which was also leaking. After some ineffectual attempts to get the siphon functioning, the American Eagle's master attempted unsuccessfully to get some help from a passing tug. American Eagle then placed a line on the Crane and pulled her stern away from the Harpalycus. Almost immediately thereafter, at about 7:30 p.m., the Crane careened to starboard and overturned, dumping her cargo.

The facts as stated above are substantially as found by the court below, and they appeared to us to be adequately supported by the evidence. The trial judge further found that the scow was seaworthy when delivered to seaboard and became unseaworthy sometime after 11 p.m. on the night of September 28. While there was no direct evidence of seaworthiness on September 27, the finding seems justified by the facts. Certainly, the testimony by the bargee that the Crane was bounced about

continuously all night, and the fact that the Metropolitan 150 which lay on the Crane's port side also sprang a leak is sufficient to support an inference that the damage occurred during the night.

■ Since it appears that the scow was delivered in good condition, and returned in a damaged state, the charterer is liable unless it can be shown that the damage resulted despite due care on its part and on the part of the subcharterer. And where, as here, it is found that the damage occurred while the scow was in the possession of the subcharterer, the latter is primarily liable unless it can show that it has discharged its duty to exercise due care. O'Donnell Transportation Co. v. M. & J. Tracy, 2 Cir., 150 F.2d 735; Seaboard etc. Corp. v. American Stevedores, 2 Cir., 151 F.2d 846; Seaboard etc. Corp. v. Moran Towing Corp., 2 Cir., 154 F.2d 399. Appellant objects that the trial judge imposed an even heavier burden on the sub-charterer. This claim is based on the statement in a supplemental opinion (D.C., 62 F. Supp. 919, 920) that "It was unnecessary for the libelants to demonstrate negligence on the part of Seaboard * * * to entitle them to a decree." This language appears in an order denying Seaboard's motion for leave to amend the pleadings, and was made after the trial judge had filed his findings and conclusions. A careful reading of his original opinion leads us to the conclusion that he meant no more by this statement than that the fact that the scow was damaged while in Seaboard's possession was enough to make out a prima facie case of negligence against the subcharterer. There can be no doubt that the ultimate issue is whether or not Seaboard was negligent.

■■ We do not believe that the subcharterer made a sufficient showing of due care. The bargee notified Seaboard that there would be trouble if the scow was not moved, and later gave notice of the leak. The notice to Seaboard required it to take reasonable steps to avoid further damage, which it did not do. The American Eagle was operated by Seaboard, and the negligence of Kivland, her master, is to be imputed to Seaboard. Kivland knew that the siphon was defective, but made no mention of that fact to his superior; consequently, no further effort was made to secure a tug in good working order. Appellant argues that it had already exhausted the possibilities of securing another tug, but the trial judge did not find this to be true, and the evidence gives little support to the contention.

Despite his knowledge that his siphon was useless, Kivland proceeded to Pier 33, made some futile attempts at siphoning, and then stood by while the scow capsized. Appellant contends that, by the time the American Eagle arrived, siphoning would have been of no avail because the cargo had already begun to shift to the starboard side. Suffice it to say that the trial judge, after studying the evidence, was not convinced that this was the case, and we find nothing in the record to indicate that his finding was clearly erroneous.

After the sinking, the tug's master drove some spikes in the bottom of the scow,[6] made a line fast, and attempted to tow her into a more sheltered berth in Hamilton Ferry dock. During these operations, she broke loose three times, but was eventually tied up at the dock and left there by the American Eagle which was tied up for the night by 10:30 p. m. By that time, the Crane had once more broken away from her berth and was drifting down toward Jay Street where she was found the next morning. The trial judge found that the tug did not discharge the duty of ordinary care in leaving the scow secured as she was.

The facts show that the conduct of the tug-master, an employee of Seaboard, was negligent throughout. Consequently, the sub-charterer was properly held primarily liable for the damage to the scow after she began to leak.

■ It is not disputed that, if Seaboard is primarily liable on account of its negligence, Evans, the charterer, is secondarily liable. Consequently, we need not discuss the matter further. We see no reason to charge Rudolph, the stevedore, with any duty other than properly carrying

---

6 He testified that these spikes were not the proper size to secure the scow.

944

out the loading, and there is no evidence that this duty was not fulfilled. The decision as to Seaboard's negligence in the hull suit is decisive of its liability in the cargo suit.

Seaboard was properly held liable and the scow secondarily liable in rem. The decision of the court below is affirmed.