TANKER HYGRADE NO. 2, Inc., Owner of THE Tank Barge HYGRADE NO. 2, Libelant,

v.

BARGE LINES, Inc., Respondent, and

Bouchard Transportation Co., Inc., and McAllister Brothers, Inc., Respondents-Impleaded, and

Windsor Navigation Co., Inc., THE Tanker DEAN H, Impleaded.

BOUCHARD TRANSPORTATION CO., Inc., Libelant,

v.

BARGE LINES, Inc., Tanker Hygrade No. 2, Inc., et al., etc., Respondents.

United States District Court
S. D. New York.
Dec. 19, 1956.

Foley & Martin, New York City, for Tanker Hygrade No. 2, Inc., Christopher E. Heckman, New York City, of counsel.

Hill, Betts & Nash, New York City, for Barge Lines, Inc., Robert Donohue, New York City, of counsel.

Purdy, Lamb & Catoggio, New York City, for McAllister Bros., Vincent A. Catoggio, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for Windsor Nav. Co., Inc., Raymond T. Greene and Stephen J. Buckley, New York City, of counsel.

Kirsel, Beck & Taylor, New York City, for Bouchard Transp. Co., Inc., Max Taylor, New York City, of counsel.

WEINFELD, District Judge.

These are separate libels by the respective owners of the tank barges Hygrade No. 2 and the B No. 7 against Barge Lines, Inc., the charterer of the two barges, to recover damages for failure to return them in the same condition as received, less ordinary wear and tear.

The Hygrade No. 2 (hereinafter called the No. 2) was owned by libelant Tanker Hygrade No. 2, Inc. The B No. 7 (hereinafter called the No. 7), was owned by libelant Bouchard Transportation Co. The barges were chartered under the "usual oral New York harbor barge charter".[1]

The barges had been towed alongside the tanker Dean H at the Staten Island anchorage from which they were to receive cargo. They had been towed there by McAllister Bros., Inc. tugs on the evening of March 18, 1952. Other barges were then immediately alongside the port and starboard sides of the Dean H; after receiving cargo they were towed away at about 5 a. m. on March 19th. Then the No. 7 was made fast with her port side to the starboard side of the Dean H in readiness to receive cargo. The No. 2 in turn was made fast outside the No. 7 with her port side to the starboard side of the No. 7. The damages to each barge were allegedly sustained through pounding, as a result of a rough sea which came up suddenly, while each was so placed alongside the Dean H.

Barge Lines, in the libel filed against it by Tanker Hygrade No. 2, Inc., impleaded McAllister Bros. whose tug had towed the No. 2 to the location of the Dean H; it also impleaded Bouchard Transportation Co., the owner of the No. 7 which lay between the tanker and the No. 2 and which had come into contact with the No. 2 during the pounding. Bouchard Transportation Co. in turn impleaded the Windsor Navigation Co. and its vessel the Dean H.

In the libel filed by Bouchard Transportation Co., owner of the No. 7, named as respondents in addition to the charterer, Barge Lines, were the following: Tanker Hygrade No. 2, Inc. and its barge, the No. 2; The Windsor Navigation Co. and its tanker the Dean H, and McAllister Bros. In this second libel Barge Lines impleaded the owner, Tanker Hygrade No. 2, Inc. and the No. 2; and also McAllister Bros. The libels and the cross libels were consolidated and upon conclusion of the trial a motion to dismiss the claims asserted against Windsor Navigation Co. and the Dean H for failure of proof was granted.

The No. 7 commenced to receive cargo from the Dean H at about 5:30 a. m. The weather was good, the sea was calm, there was hardly a breeze. But about 7:00 a. m. the wind came up suddenly causing heavy swells. Thereafter the wind increased in velocity, the swells also increased in size, the water was choppy and the weather bad. There came a time, precisely when it is not clear on this record, when the two barges were "bouncing good", the No. 2 pounding against the No. 7 which in turn was pounding against the Dean H. The No. 2 lost two fenders and then a third which were on her port side. About 8:30 a. m. two spring lines between the No. 7 and the Dean H parted and were replaced. Shortly thereafter the Captain of the No. 7, because of increasingly rough weather conditions, requested the Master of the Dean H to call the Barge Lines office for

1. Under this arrangement the charterer agrees to pay a fixed rate per day for an indefinite period and the owner agrees to supply a barge and crew. See Pennsylvania Railroad Co. v. McAllister Bros., D.C.S.D.N.Y., 137 F.Supp. 788, 792.

a tug to take the barge away, even though she was not fully loaded. At 9:05 the Dean H stopped discharging oil into the No. 7 at the latter's request, due to the heavy weather, and at 9:15 the hose was disconnected. At about 9:30 the seas became so rough that the hawser from the No. 7 to the Dean H either parted or slipped off the bitt of the Dean H, and thereafter the other lines were loosened and the No. 7 and the No. 2, still lashed together, broke away and went adrift. Within 15 minutes a Standard Oil tug which responded to a general call placed by the Dean H came along and took the No. 7 to Pier 8, Staten Island, and the No. 2 came to anchor about 300 feet off the Stapleton piers. The damages to the barges allegedly occurred during the pounding.

I think it is desirable to dispose first of the claim asserted by Barge Lines, the charterer, against McAllister Bros., which concededly did not have a tug at the scene to tow away the No. 7 and the No. 2 at 8:30 a. m., at which time the former was less than half loaded and the latter entirely without cargo.

■ The essence of this aspect of Barge Lines' claim is that pursuant to prior arrangement McAllister Bros. was to have tugs at the anchorage not later than 8:30 a. m. on March 19th to tow the barges away, regardless of whether the loading was completed. On a careful review of the evidence, my trial notes, and based upon observation of those witnesses who testified, I am of the view that the plea must fail. I find that the charterer has failed to sustain its burden of proof that such was the agreement. On the contrary, I am persuaded that the evidence supports a finding that the charterer was to give McAllister Bros. two hours notice so as to synchronize the arrival of the tugs with the completion of the loading of the barges, and this it failed to do.

Further, since upon Barge Lines' theory McAllister Bros. was not required to stand by while the barges were being loaded but to pick up the tows in any event at 8:30, McAllister Bros. may not be held accountable unless it is established that the damage occurred after 8:30 a. m. Otherwise it cannot be said that the failure of the tugs to be present at 8:30 to tow the barges away was the proximate cause of the damages to each.

There is no clear evidence as to when the damages were sustained. The Captain of the No. 2 testified he did not know exactly when the damage to his barge occurred. The Captain of the No. 7 testified that the damage to his barge occurred between 0700 and 0945. With the evidence so unclear and unconvincing as to the time of the damage, this alone would preclude recovery. Moreover, under the view that the arrangement between McAllister Bros. and Barge Lines was for the latter to give notification in time to synchronize completion of loading with the towing job, there is no basis upon which to hold McAllister Bros. The Master of the Dean H as requested by the Captain of the No. 7 called the Barge Lines office for a tug. Golden, the dispatcher who received the call, places its receipt at shortly before 9:00 a. m. The required time for a tug to have reached the anchorage following notification, which was known to the charterer, was 45 minutes. Under this circumstance it is clear that the tug could not have reached the barges in time to avert the damage.

Upon all the evidence the respondent Barge Lines' claims against McAllister Bros. are dismissed for lack of proof.

■ The issue that remains is whether Barge Lines, the charterer, or the respective owners of the barges, must bear the damage loss. Since each barge was delivered in good condition and returned in a damaged state, a prima facie case of negligence was made out against Barge Lines and the burden of going forward is upon it to establish that it discharged its duty to exercise due care or that in fact liability rests upon the owners or others.[2] This it seeks to do by

---

2. Seaboard Sand & Gravel Corp. v. American Stevedores, 2 Cir., 151 F.2d 846; cf. The C. W. Crane, 2 Cir., 155 F.2d 940, 943.

stressing that under the oral New York harbor barge charter the barge captain remained the representative and agent of libelant, the owners, insofar as the care of the barge and its internal economy were concerned, notwithstanding the charter was a demise of the barge. The charterer emphasizes that in furnishing the barge captain the owner warranted he was fully competent to perform his duties; further, that the duties of the barge captain were to tend the barges and the lines to see that they were kept seaworthy and in safe operating condition.[3] Accordingly Barge Lines claims the owner is chargeable with the barge captain's failure to take care of the barge and hence if any damage were occasioned by reason of such failure this must be borne by the owner and it, the charterer, may not be held liable.

But this concept does not answer our problem since the evidence fully establishes that each barge captain competently performed his duties insofar as the care of the barge was concerned and properly tended her lines. Considering the prevailing conditions and the suddenness with which they developed, it cannot be said there has been a showing of inefficiency or bad seamanship on the part of the barge captains.[4]

The sole remaining charge of negligence that can be levelled against each barge captain is failure promptly to call for a tug to tow the barges away when the sea whipped up and it was evident that danger was ahead by way of pounding. This charge cannot be sustained. The evidence supports a finding that each captain did all that could reasonably be required under the circumstances. When it appeared that assistance might be needed the request was made of the Master of the Dean H to call Barge Lines for a tug. Indeed, the Master of the Dean H, when he left his tanker after making a call, was of the view that conditions were satisfactory pending the arrival of the tugs.

Moreover, negligence may be attributed to the representatives of Barge Lines, Inc. in its dispatching office for failure to make adequate arrangements to have tugs available to tow the barges in the event a necessitous situation developed —as in fact it did. It was generally known that conditions in the anchorage area frequently whipped up suddenly presenting dangerous situations which would require removal of the barges on short notice.

The respective libelants are entitled to a decree against Barge Lines. There is no basis to support Barge Lines' cross claims. A decree may be entered accordingly.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Should the parties desire seriatim findings they may be proposed in accordance with this opinion.

3. Lynch v. Agwilines, Inc., 2 Cir., 184 F. 2d 826, 829; Pennsylvania Railroad Co. v. McAllister Bros., D.C.S D.N.Y., 137 F.Supp. 788, 793.

4. Cf. Johnson v. United States, 2 Cir., 74 F.2d 703, 705.