TANKER HYGRADE NO. 2, Inc., Appellee,

v.

BARGE LINES, Inc., Appellant.

BOUCHARD TRANSPORTATION CO., Inc., Appellee,

v.

BARGE LINES, Inc., Appellant.

Nos. 88, 89, Dockets 24522, 24523.

United States Court of Appeals Second Circuit.

Argued Nov. 19, 1957.

Decided Dec. 20, 1957.

Robert Donohue and Edwin Longcope, Hill, Betts & Nash, New York City, for appellant.

Max Taylor, Krisel, Beck & Taylor, proctors and Maurice A. Krisel, New York City, advocate, for Bouchard Transp. Co., Inc., appellee.

Christopher E. Heckman, Foley & Martin, Edward J. Ryan, New York City, of counsel, for Tanker Hygrade No. 2, Inc., appellee.

Vincent A. Catoggio, and Purdy, Lamb & Catoggio, New York City, for McAllister Bros., Inc., impleaded, appellee.

Steven Buckley, New York City, for Windsor Nav. & Tanker Dean "H," appellees.

Before HAND, HINCKS and LUMBARD, Circuit Judges.

PER CURIAM.

These two appeals are from interlocutory admiralty decrees of Judge Weinfeld in favor of the libellants, directing a reference to a master to compute the damages to their oil barges while on "bareboat" charter to the respondent, Barge Lines, Inc., which impleaded McAllister Brothers, Inc., a tugboat company, seeking to hold it for any damages. The respondent used the barges to discharge an oil tanker, moored off Stapleton in New York Harbor, alongside of which they were made fast during the night of March 18–19, 1952, and where they were injured during the morning of the 19th by pounding against each other in a sea that sprang up somewhat suddenly. The respondent had employed the tugboat company to lay the barges alongside the tanker in the afternoon of the 18th, Barge No. 7 next to her, and Barge No. 2 outside No. 7.

■■ Judge Weinfeld heard the witnesses and found that the respondent had "failed to sustain the burden of proof" that the tugboat company had agreed to "have tugs at the anchorage not later than 8:30 a. m. on March 19th to tow the barges away, regardless of whether the loading was completed." On the contrary he was "persuaded that the evidence supports a finding that the charterer was to give McAllister Brothers two hours notice so as to synchronize the arrival of the tugs with the completion of the loading of the barges, and this it failed to do." We find it hard to understand the argument that we should declare this finding "clearly erroneous," because Golden, the "night despatcher" of the respondent swore that the arrangement was subject to an exception that "if it was a tide job which you absolutely had to make to provide oil for a day's business, you would say, 'Tell the tug when you get there to stop her,' stop loading the minute he arrives alongside, button her up and take her away." The issue depended upon whom to believe, and, although it appears to be impossible to persuade the bar that we will not review such a decision, we can do no more than once again to report what we have said so often. We therefore affirm so much of the decrees as dismissed the petitions impleading McAllister Brothers, Inc.

The question remains, however, whether the respondent failed to take adequate care of the libellants' barges during the morning of the 19th. It is common ground that at some time before 9:30 on that day, the wind freshened

enough at the place where the tanker lay to make the barges begin to pound against each other and against the tanker; and that eventually so much sea was raised that at a little after 9 they had to be cast adrift, to be picked up later by a Standard Oil Company's tug which brought them to safe berths. The tanker's berth was well known to be subject to sudden accesses of rough weather and the U. S. Weather Bureau at 11 p. m. on the 18th had issued a "small craft warning," forecasting "increasing winds mostly southeasterly tonight," and adding that there would be on "Wednesday fresh to strong shifting winds." Although the respondent had a night despatcher at its office during that night, he made no inquiry for any Weather Bureau report. It only took about 45 minutes to reach the tanker from the respondent's place of business, and it does not appear that no tugs were available.

■■ It is the duty of such a charterer to provide a safe berth for the vessel, and he is charged with knowledge of any Weather Bureau storm warnings. Doherty v. Pennsylvania R. R. Co., 2 Cir., 269 F. 959; Bouchard Transp. Co. v. Pennsylvania R. R., 2 Cir., 6 F.2d 362. It is true that neglect to acquaint himself with such warnings is not enough in all circumstances to charge the charterer (The Imoan, 2 Cir., 67 F.2d 603), but in the case at bar, not only were the barges exposed as they lay, but the respondent had at least eight or nine hours to send relief after the warning was issued of the approach of "strong, shifting winds." We agree with Judge Weinfeld that [148 F.Supp. 179] "since each barge was delivered in good condition and returned in a damaged state, a prima facie case of negligence was made out against Barge Lines and the burden of going forward is upon it to establish that it discharged its duty to exercise due care or that in fact liability rests upon the owners or others." [1]

■■ It seems hardly necessary to discuss the argument that the bargees should have asked the tanker to send for help. It is true that the bargee on such a vessel has a larger responsibility than merely to keep her dry and to tend her lines; but it would have been wholly unwarranted to impose upon the bargees on these barges the added duty of anticipating such weather as would endanger them. The decisions are many that they are not qualified seamen, and in the case at bar any warning that they could have got to the respondent after the barges began to pound would have been too late.

Decrees affirmed.

1. Seaboard Sand & Gravel Corp. v. American Stevedores, 2 Cir., 151 F.2d 846; cf. The C. W. Crane, 2 Cir., 155 F.2d 940, 943; Richmond Sand & Gravel Corp. v. Tidewater Construction Corp., 4 Cir., 170 F.2d 392, 393, 394.