**MORAN TRANSPORTATION CORPORATION, Libellant,**

v.

**NEW YORK TRAP ROCK CORPORATION, Respondent.**

United States District Court
S. D. New York.
May 22, 1961.

Burlingham, Hupper & Kennedy, New York City, Eugene Underwood, Robert A. Feltner, New York City, of counsel, for libellant.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, Henry C. Eidenbach, Thomas P. Pender, New York City, of counsel, for respondent.

McGOHEY, District Judge.

The libellant sues to recover damages resulting from the sinking of its deck scow Moran No. 107 while under charter to the respondent.

The respondent concedes the libellant made out a prima facie case, thus casting on the respondent the burden of establishing that the loss did not result from its failure to exercise due care. It contends it has sustained that burden and shown that the "damage to the Moran No. 107 was due solely to an Act of God." That contention is, in all respects, rejected.

The court's findings and conclusions are set forth in the opinion.

The Moran No. 107 was delivered to the respondent in good condition on

March 23, 1954 pursuant to an oral charter of the kind common in New York Harbor, for a term extending through November, 1954. Damage unrelated to this suit caused the scow to be withdrawn for repairs on September 25, 1954. Upon completion of these she was redelivered to the respondent under the charter on October 5, 1954. She was then in good condition. The scow sank at the respondent's dock at Tomkins Cove, New York, on the night of October 15, 1954 during a severe storm known as Hurricane Hazel.

Tomkins Cove is about 35 miles from New York City on the west bank of the Hudson, about three-quarters of a mile across the river from Verplanck Point and about five miles north of Haverstraw Bay. Trap Rock's installation consists of a quarry, a stone-crushing plant and a dock, to which crushed stone is carried by a conveyor and loaded on scows moored alongside. About a quarter of a mile south of Trap Rock's dock the west shore of the river curves eastward for about 2,000 feet along Stony Point, a rock formation which rises to a height of between 125 and 150 feet above the river.

The dock is between 650 and 700 feet long and runs roughly north and south. The northerly portion is called the "light rack." The southerly portion is called the "loaded rack." The portion in between is called the "loading area." Deck scows used for carrying crushed stone are, on average, about 115 feet long and 35 feet wide. Not more than six scows lying end to end, as is customary, can be tied up alongside the dock; two at the "light rack", one at the "loading area" and three at the "loaded rack." The "loading area" is not used for mooring scows overnight. Thus, when more than five are on hand they are made fast in tiers outside those tied to the racks.

Light scows, on arrival, are moored at the "light rack." As needed, they are moved down to the "loading area." After being loaded they are moved down to the "loaded rack," and tied up to await make-up of a tow. A scow is pulled from north to south by means of a cable rigged from the scow through blocks to a truck moving inland from the "loaded rack." This arrangement cannot move scows in the reverse direction. A tug is required for that.

The depth of the water alongside the "loading area" and the "loaded rack" is maintained at not less than 15 feet by dredging. This depth is adequate for loaded scows. Only light scows can lie safely alongside the "light rack" because the water there is not more than seven feet deep. However, 35 feet, the width of one scow, out from the "light rack" the water is deep enough for loaded scows to lie safely there.

The Moran No. 107 was the last of eight scows loaded when work ceased at 5:00 P.M. on October 14. She was then moored alongside the "loaded rack" just south of the "loading area." The seven other scows had been moored earlier in two tiers whose inside boats took up the balance of the "loaded rack."

The northward progress of the hurricane had been widely publicized by press and radio reports for several days before the 14th. The respondent's dispatcher in New York and its supervisory officials at Tomkins Cove had read and heard these reports. At about 4:00 P.M. on the 14th the Weather Bureau warned of the storm's approach from Hatteras at 25 miles per hour, and that it presented a definite threat all along the North Atlantic Coast. At about the same time the libellant's official in charge of its scows and barges called the respondent's dispatcher in New York, warned him the storm was expected to reach New York the next day and asked that Moran's scows be securely berthed. At 8:00 P.M. on the 14th and frequently throughout that night and the morning of the 15th, additional Weather Bureau warnings were broadcast advising that southeast winds of gale force would develop and that all precautions should be taken for the protection of life and property.

In a southeast storm the wind has an almost unbroken sweep of five miles across Haverstraw Bay south of Tomkins Cove. Stony Point affords the

respondent's installation little, if any, protection in such a storm. Indeed, when the assistant superintendent and the loading foreman arrived at the dock at 6:30 A.M. on the 15th a "stiff breeze" out of the southeast was hitting the area, making the water "pretty choppy" and the tide "higher than normal." These men had radios in their homes and cars; and there was at least one in their office at the dock. They heard the early morning weather reports. During the morning they heard the additional reports concerning the storm's severity and direction. All these reports were confirmed by the actual weather conditions at Tomkins Cove which grew progressively worse as the morning wore on. The wind continued out of the southeast. It was, or should have been, obvious to the respondent's supervisors there that the loaded scows in the southernmost tier would be subjected to increasing danger as the force of the winds and the tides increased. Indeed it is not disputed that the outside scows in this tier were exposed to danger in a southeast storm and that the strain on the lines of the inshore scows would increase if more scows were added to that tier. No attempt was made to reduce the danger by redistributing the scows in shorter tiers or by removing some of them, at least, from Tomkins Cove. The respondent did not show that safe berths were unavailable north of Tomkins Cove. And it clearly appears that some scows, at least, could have been berthed at the respondent's dock just across the river at Verplanck Point where, in fact, one of its own scows safely survived the storm. In any event, although one and perhaps two Cornell tugs were at the dock the morning of the 15th, no attempt was made to move any of the loaded scows or to tow them to some safer location. The tugs were not even asked to do so. The respondent did not call the captains of these tugs as witnesses.

There were ten light scows at the dock in addition to the eight loaded scows on the morning of the 15th. It was then possible for all eighteen scows to be berthed at the respondent's dock with far less danger from the southeast winds by redistributing them in six tiers along the dock with three scows in each tier. This could have been accomplished readily by the tug or tugs which were then on hand. It was not done. On the contrary, work went on as usual. In preparation for a normal day's loading, the Moran No. 107 was moved from her relatively safe berth alongside the "loaded rack" and together with the B. Turecamo was placed in the southernmost tier which was thereby increased to six loaded scows. Moreover, the Moran No. 107 was placed in the most exposed position possible as the outside scow, about 200 feet out from the "loaded rack."

Seven additional scows had been loaded by 3:00 P.M. when work had to be stopped because the rising tide "made it impossible" to get a light scow under the conveyor at the "loading area." The water was then very rough and the force of the wind was increasing. There were then fifteen loaded scows at the "loaded rack" in two tiers of six and one tier of three. The "loading area" was left unoccupied as usual, and three light scows were at the "light rack." It was clearly evident by then, at least, that Stony Point afforded no protection from the increasing southeast wind to the loaded scows as they then lay and as they were to be left overnight. Nevertheless, although it was probable that tugs still could have at least redistributed the scows along the dock, in six tiers of three each, no attempt was made to summon tugs. It was not shown that tugs were unavailable. After 3:00 P.M. the only thing done was to put out some additional lines. The scows were left as they lay. Trap Rock's men went home, as usual, shortly after 5:00 P.M. They were later called back, but they did not arrive at the dock until 7:30 P.M. and by then most of the scows were already adrift.

At 6:30 P.M. the scows were pitching so hard that their captains went ashore for their own safety. At about 7:00 P.M. the lines between the second and third scows in the southernmost tier

parted and the four outside scows in that tier broke away. This started a chain reaction which caused scows in the adjoining tiers to break away also. All these were driven up the river "in a helter-skelter mess." The B. Turecamo drifted north alongside the Moran No. 107 and at a point just above the "loading area" capsized on top of her and she sank. Ten of the eighteen scows at Tomkins Cove were lost.

 Hurricane Hazel was not an Act of God. At Tomkins Cove it was neither so sudden nor so violent that Trap Rock's experienced men who had not less than twenty-four hours' warning could not have taken precautions to guard against it.[1] But these repeated warnings simply went unheeded. Both the loading foreman and the assistant superintendent testified that New York weather reports were, as a matter of course, disregarded at Tomkins Cove because of its distance from New York. Such a practice, however reasonable it may have been with respect to routine reports of local weather conditions in New York, was not consistent with a charterer's duty of care in the face of repeated warnings of approaching southeast winds of gale force in an October hurricane. Both these men had been employed at Tomkins Cove when, in 1950 or 1951, a hurricane caused damage there. This fact, coupled with their personal observations of the conditions there on the morning of the 15th which bore out the forecasts they had heard, disposes of the contention that they were justified in ignoring the Weather Bureau warnings because these did not precisely predict that the hurricane would reach the Hudson River Valley at Tomkins Cove.

Although not pleaded in its answer to the libel, the respondent urges in its brief after trial that the libellant's scow captain was negligent in failing to protest about the removal of his scow to the outside of the southernmost tier and in failing to notify the libellant of this. This defense is rejected on the authority of Tanker Hygrade No. 2, Inc. v. Barge Lines, Inc.[2] and The BB No. 21.[3]

The respondent has failed to sustain its burden. The libellant is entitled to recover its damages and costs. A decree in accordance herewith may be submitted, providing for a reference of the question of damages to a Special Master if the parties cannot agree on the amount of these.

1. See General Public Warehouse Co. v. Queen Line, Ltd., D.C., 177 F.Supp. 916; Patapsco Scrap Corp. v. Maryland Shipbuilding and Drydock Co., 4 Cir., 268 F. 2d 817. In both these cases Hurricane Hazel was involved.

