**TIDEWATER CONSTRUCTION CORPORATION, Raymond International, Inc., and Peter Kiewit Sons' Company, a joint venture trading as Tidewater-Raymond-Kiewit, Libelants,**

v.

**SOUTHERN MATERIALS COMPANY, Inc. and Merritt-Chapman & Scott Corporation, both corporations, in personam, Respondents.**

No. 8352.

United States District Court
E. D. Virginia,
Norfolk Division.

June 24, 1967.

Jett, Sykes & Berkley, Norfolk, Va., W. L. Berkley, III, Norfolk, Va., for Tidewater-Raymond-Kiewit.

Vandeventer, Black, Meredith & Martin, Norfolk, Va., Braden Vandeventer, Jr., Norfolk, Va., for Southern Materials.

Williams, Cocke, Worrell & Kelly, Norfolk, Va., Jack E. Greer, Norfolk, Va., for Merritt-Chapman & Scott.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

Libelants, at all times pertinent hereto, were contractors and constructors of the bridge and tunnel project across the mouth of the Chesapeake Bay connecting an area known as Chesapeake Beach in the City of Virginia Beach, Virginia, and Kiptopeke, Northampton County, Virginia, now known as the "Chesapeake Bay Bridge-Tunnel".

Southern Materials Company, Inc. (Southern) is the owner of an undocumented barge referred to herein as "Barge No. 1". During the course of the construction of the bridge-tunnel project it was necessary to transport a great quantity of rock for the purpose of making an island in the Chesapeake Bay on the south side of Thimble Shoals channel. Merritt-Chapman & Scott Corporation (Merritt-Chapman) contracted with libelants to construct the island in question and, in turn, on December 5, 1960, executed a purchase order agreeing to purchase from Southern certain types of gravel and rock to be used in the construction of the island according to the terms of the agreement between Southern and Merritt-Chapman. This contract, which will be considered in detail at a subsequent point, provided that Southern was to furnish two or more moorings in the vicinity of the actual work sites; that Southern would lift and transport the gravel and rock by Southern's barges to the moorings; that Merritt-Chapman would then tow Southern's barges from the moorings to the islands and, after depositing the gravel and rock, would return the barges to the moorings.

On January 1, 1962, Southern's Barge No. 1 was tied to one of the Moorings lying to the east of what is known as Trestle "A". It was brought there by a tug of Curtis Bay Towing Company of Virginia pursuant to a contract between Southern and Curtis Bay. Merritt-Chapman took the barge from its mooring and placed it alongside a floating derrick at the island site where the cargo was partially discharged. At some time between 3:00 and 3:30 P.M. on January 1, 1962, Merritt-Chapman returned Barge No. 1 to its mooring where the barge was secured in the manner hereinafter described. A rather sudden and severe storm had come up around 3:00 P.M. and, approximately four and one-half to five hours later, Barge No. 1 parted its lines. The winds and tides carried the barge to a point of impact with the batter piles on the

east side of Trestle "A", thus doing rather extensive damage to the piles which constituted a portion of the project under construction by the libelants for the owner, Chesapeake Bay Bridge-Tunnel Commission.

As the trial date approached a settlement in the sum of $13,500.00 was effected with the libelants, reserving for further consideration the rights and liabilities *inter sese* of Southern and Merritt-Chapman, the latter two parties having filed cross-libels and impleading petitions against each other.

We are called upon to determine the responsibility as between Southern and Merritt-Chapman with respect to Barge No. 1 breaking loose from its mooring as applied to the purchase order contract.

The following clauses of the contract between Southern and Merritt-Chapman are deemed pertinent for discussion.

*"MOORINGS:*

Vendor [Southern] is to furnish and maintain two (2) or more moorings in the vicinity of the actual work sites (1 mooring-vicinity of Thimble Shoal Island) (1 mooring-vicinity of Baltimore Channel islands).

The site of each mooring is to be approved by our [Merritt-Chapman] Project Manager.

Vendor is responsible for obtaining permits, furnishing necessary navigational markers and maintaining same 24 hours per day, 7 days per week.

Vendor [Southern] is responsible for tying up to the moorings."

*"BARGES:*

Vendor [Southern] has stated that barges he proposes using in the performance of this order will average from 180 to 220 feet in length, with a capacity of approximately 900 to 1,800 tons of stone; approximately 38 to 42 foot beam; approximate draft of 8 feet. The anticipated number of barges required will be between eight (8) and twelve (12) and vendor [Southern] agrees to furnish additional barges and

tugs if required to maintain above schedule.

Vendor [Southern] is responsible for the safety of its equipment while tied up at the moorings and is to remove the equipment to safe moorings at its cost in the event of storms and unfavorable weather conditions. The barges which vendor will use in the performance of this Contract will be of steel construction with necessary deck protection to permit the use of tractors and to withstand the impacts normally occurring in the unloading of the material. The barges will be certified for this operation and so equipped as to comply with all prevailing Coast Guard requirements for markings, lights, etc."

*"INSURANCE:*

Vendor [Southern] is responsible and liable for all of its equipment while loading, towing to the job site, and tied up at its moorings.

Vendor [Southern] shall indemnify and hold harmless Merritt-Chapman & Scott Corporation and the Owner from all damages to persons (Including death at any time resulting therefrom) or property that may occur by reason of any act or omission whether negligent or otherwise, by or on the part of the Vendor [Southern] in connection with the prosecution or the failure to prosecute the work and/or any of its obligations under this Agreement and from damages, penalties and/or fines resulting from Vendor's failure to obey applicable Federal, State or local laws, ordinances, regulations, or administrative rulings."

*"INDEMNIFICATION:*

Merritt-Chapman & Scott Corporation is responsible for the barges while under tow from the moorings to the islands for the constructive placing of the stone and returning to the moorings."

Assuming arguendo that Merritt-Chapman returned Barge No. 1 to its mooring and there secured the same, but did so in a manner which may be considered improper, and the lines of the barge parted after approximately four hours of extremely adverse weather conditions, can Southern hold Merritt-Chapman liable under the terms of the purchase order contract? Under the particular facts of the case this inquiry must be answered in the negative.

On the morning of January 1, 1962, Southern's barges Nos. 1, 5, 11 and 42, along with the barge NEWPORT NEWS, were located at the job site in the vicinity of the Thimble Shoal islands. At 8:00 A.M., Barge No. 1 was alongside Merritt-Chapman's rig CARIBOU being unloaded by Merritt-Chapman. Between 11:00 and 11:30 A.M., Barge No. 1 was moved by Merritt-Chapman to their rig APACHE and the unloading continued. Between 3:00 and 3:30 P.M., Barge No. 1 was taken by Merritt-Chapman from the rig APACHE and placed behind Southern's Barge No. 11 on the south mooring. The tug PERCHERON, operated by Merritt-Chapman, secured Barge No. 1 to the after end of Barge No. 11 by placing both bridles from Barge No. 1 over the starboard after corner bitts on Barge No. 11. The weather conditions, which had been reasonably good throughout the morning, began to deteriorate in the afternoon, and a severe storm struck at about 3:00 P.M. When Barge No. 1 was moored to Barge No. 11 by the PERCHERON, the wind was blowing 30 to 35 miles per hour, with gusts to 50 miles per hour, and seas of 4 to 6 feet.

The method used by the crew of the PERCHERON in mooring Barge No. 1 is vigorously attacked by Southern. Evidence has been presented establishing that the safest and best method for mooring one barge to another is to place the same in tandem with the starboard bridle from the second barge leading to the starboard after bitt of the lead barge, and the port bridle from the second barge leading to the port after bitt on the lead barge. The method adopted by the PERCHERON undeniably increased the tendency of the barges to yaw, but even

if the barges had been moored in tandem there would still be a tendency to yaw, especially in high winds and rough seas.

Southern learned, through monitoring the radio broadcasts of the PERCHERON, that Barge No. 1 was being placed on the south mooring. However, it was not until 4:30 P.M. that Merritt-Chapman advised Southern that Barge No. 1 was at the mooring. We attach little significance to the delay, if any, in notification as one of Southern's officers actually heard the radio broadcast and knew of the mooring at or about the time the mooring was accomplished.

Southern did not request Merritt-Chapman to return any barge to a mooring on the day in question. At approximately 1:45 P.M. Southern dispatched the tug DIXIE to the area and the tug took the barge NEWPORT NEWS in tow shortly after 2:00 P.M., but did not return thereafter. The barges were not, of course, seagoing barges and their ability to withstand the elements was limited. Southern did not request the assistance of additional tugs either to evacuate the barges or to stand by in the event of threatening weather. It is generally conceded that Southern had the right to order the area cleared if necessity prompted such action. Although the contract had been in force for more than a year, Merritt-Chapman never evacuated any of Southern's equipment prior to the day in question.

At some moment between 7:30 and 8:40 P.M., Barge No. 1 broke loose from the moorings. It was observed to be riding on the mooring at 7:30 P.M., but was missing at 8:40 P.M.

The thrust of Southern's case lies in the allegedly negligent mooring of Barge No. 1 to Barge No. 11 which was completed at approximately 3:30 P.M. While impressed with the testimony of Southern's experts, McIntyre and Eirich, and conceding the correctness of their testimony to the extent of saying that barges moored in tandem have a lesser tendency to yaw than a barge moored in the manner adopted by the PERCHERON, we note with interest that McIntyre, in considering the overall program in advance of the work, deemed that light barges would remain on the buoy for a minimal period of time. If the weather conditions were fine, the time could be prolonged, but if the weather was threatening, the light barges should be brought in. Even with good weather conditions, McIntyre gave an estimate of three or four hours during which it was contemplated that a light barge would remain at a mooring, and this assumes that barges are moored in tandem. Thus we have a situation in which a barge, allegedly moored improperly, remained moored for the approximate length of time that McIntyre considered a light barge should remain on the mooring during good weather.

Southern argues that Barge No. 1 was in the "custody" of Merritt-Chapman from the time it was removed from the mooring to be unloaded at the rig until it was returned and properly placed on the mooring. It is contended that a bailor-bailee relationship existed. Doherty v. Pennsylvania R. Co., 269 F. 959 (2 Cir., 1920); Allied Chemical & Dye Corp. v. The Christine Moran, 190 F. Supp. 703 (S.D.N.Y., 1961); P. Dougherty Co. v. The G. M. McAllister, 159 F. 2d 486 (2 Cir., 1947). We agree that Merritt-Chapman had the duty to exercise ordinary care in mooring Barge No. 1 "under the circumstances then existing". Our disagreement with Southern rests in what constituted ordinary care under the circumstances. We do not agree that the bailor-bailee relationship existed after the barge had been returned to its starting point at the south mooring. A towage contract does not *per se* give rise to a bailor-bailee relationship. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932).

At approximately 4:00 P.M., the weather was so bad that Southern's tug DIXIE, of the same class as the PERCHERON, could not even get out to the job site from Little Creek to take care of Southern's equipment. With these same weather conditions, Southern criticizes the decision of Captain Lewis of the tug PERCHERON in mooring the

barge as he did. A deckhand from the PERCHERON was successful in getting onto Barge No. 1 and the single corner bitt was lassoed. However, to place a line on each of the after corner bitts of Barge No. 11 it would have been necessary to transfer a man onto Barge No. 11. Considering the fact that Barge No. 11 was light, whereas Barge No. 1 was still partially loaded, such a transfer from a lower to a higher position would endanger the life of any individual attempting such a maneuver. Faced with this alternative and knowing that Southern was charged with the responsibility of protecting its own equipment, Captain Lewis chose a course of conduct which was reasonable under all the circumstances. As said in Richmond Sand & Gravel Ccrp. v. Tidewater Const. Corp., 170 F.2d 392, 395 (4 Cir., 1948):

> "It is not required that parties in emergency situations choose what in retrospect appears to have been the best possible course of action. * * * It is here sufficient if Tidewater's employees acted in the exercise of their best judgment and if the course they pursued was reasonable under the circumstances confronting them. Mere errors in judgment in this situation— if in fact any existed—would not constitute actionable negligence."

Compare United Geophysical Company v. Vela, 231 F.2d 816 (5 Cir., 1956); The Imoan, 67 F.2d 603 (2 Cir., 1933).

 It might be argued that in view of the sudden deterioration in the weather conditions at the time that the PERCHERON moored Barge No. 1, it should have taken the barge into Little Creek, rather than leaving it exposed to the hazardous conditions in the bay. While such a course of action might have been commendable, Merritt-Chapman clearly had no duty to do so, since the contract provided that Southern was responsible for removing its equipment to safe moorings in the event of bad weather. Southern was aware that Merritt-Chapman was mooring Barge No. 1 in the bay and it might have requested Merritt-Chapman to bring the barge in, yet no such request

was made. Nor can we charge Merritt-Chapman with fault for failing to specifically advise Southern that the barge was being moored until ninety minutes later, in view of the fact, as previously mentioned, that Southern had actual notice of the mooring at the very time it was being accomplished. Thus the failure to give notice to Southern was clearly not the proximate cause of the ensuing damage.

On the contrary, we conclude that the proximate cause of the damage was Southern's failure to properly care for its barges in the job area. Under the terms of the contract, Southern had full responsibility for the barges while they were moored in the job area. It had two vessels, the DIXIE and the LITTLE SPEC, which were assigned full time to care for Southern's barges at the job site, and Southern had an arrangement with Curtis Bay whereby other tugs could be made available to Southern when needed. However, no request for additional assistance was made on the afternoon in question, despite the fact that Southern had five barges in the job area on the morning of January 1st, and the 6:00 A.M. weather forecast indicated that northeasterly winds, ranging from 10 to 25 knots, were to be expected in the afternoon, increasing to 20–30 knots the following day. In spite of this forecast, both the DIXIE and the LITTLE SPEC left the job area at about 11:25 A.M. to render assistance to a disabled cabin cruiser. The LITTLE SPEC took the disabled vessel in tow and proceeded to Little Creek. At 2:10 P.M., this job having been accomplished, she attempted to return to the bay but was turned back by rough seas. In the meantime the DIXIE had returned to the job area and had taken the barge NEWPORT NEWS in tow, arriving at Little Creek around 3:30 P.M. She attempted to return to the bay to pick up another barge, but was forced back by heavy seas at around 4:00 P.M.

We conclude under these facts that Southern was derelict in its duty to care for its barges moored in the job site

area. A case essentially in point is Tanker Hygrade No. 2 Inc. v. Barge Lines Inc., 148 F.Supp. 177 (S.D.N.Y., 1956), affirmed 250 F.2d 678 (2 Cir., 1957), in which a charterer was held liable to a barge owner for damages to barges left alongside a loading tanker during a sudden storm. The district court said:

"Moreover, negligence may be attributed to the representatives of Barge Lines, Inc. in its dispatching office for failure to make adequate arrangements to have tugs available to tow the barges in the event a necessitous situation developed—as in fact it did. It was generally known that conditions in the anchorage area frequently whipped up suddenly presenting dangerous situations which would require removal of the barges on short notice." /

While the severity of the storm which struck on the afternoon of January 1st exceeded everyone's expectation, there was the hint of bad weather earlier in the day, and Southern would have been well advised to take added precautions such as calling on Curtis Bay for additional tugs. Not only did it fail to do this, but Southern's only two vessels on the scene saw fit to leave the job area to render aid to another vessel. While we cannot condemn Southern for this errand of mercy, it does not serve to excuse it from the events which followed.

■ We hold that Southern was solely responsible for the damage incurred by libelants. Additionally, we hold that Southern is not entitled to any recovery on its cross-libel against Merritt-Chapman for damage to Barge No. 1, in view of the factual findings above.

■ There remains the issue of indemnity. Merritt-Chapman contends that under the "hold harmless" clause of the purchase order contract it is entitled to be indemnified for its costs and attorney's fees. We agree. It is now well settled that these items are recoverable in maritime suits even where the principal action is settled before trial, as in this case. Rederi A/B Dalen v. Maher,

303 F.2d 565 (4 Cir., 1962); Bailey v. United States, 260 F.Supp. 48 (E.D.Va., 1966). Such a recovery may be based either upon an implied warranty, as in *Maher,* supra, or upon an express contractual provision. See Holley v. The Manfred Stansfield, 186 F.Supp. 805 (E.D.Va., 1960) and cases therein cited. However, the right to indemnification for attorney's fees and expenses is limited to those incurred in defending the principal action and does not include services rendered in prosecuting the claim for indemnity. Paliaga v. Luckenbach Steamship Co., 301 F.2d 403 (2 Cir., 1962); Bailey v. United States, supra. We think that the same rule should apply as between parties alleged to be at fault, wherever there is an express or implied agreement to indemnify or hold harmless. It might well be that an express indemnity agreement could validly include a requirement that the indemnitor pay *all* costs and attorney's fees, both those incurred in defending the principal claim and those incurred in prosecuting the claim for indemnity. However, we do not construe this contract to be such an agreement. The contract merely requires Southern to "indemnify and hold harmless Merritt-Chapman & Scott Corporation and the owner from all damages to persons * * * or property that may occur by reason of any acts or omission * * * by or on the part of [Southern]." It makes no mention of attorney's fees or costs. In view of the settled policy against allowing items pertaining to attorney's fees and expenses in prosecuting third-party actions in relation to the establishment of an indemnity claim, we are not inclined to allow the same unless they are specifically covered in the hold harmless agreement.

Merritt-Chapman will accordingly be granted an opportunity to establish what portion of its attorney's fees and costs should be allotted to defending the principal claim asserted by the libelants. If the parties cannot agree on a reasonable amount, a hearing will be afforded on this issue only. An order may then be entered in accordance with this opinion.