ISTHMIAN S. S. CO. v. MARTIN.

The ENSLEY CITY.

No. 5727.

United States Court of Appeals
Fourth Circuit.

Sept. 23, 1948.

---

SOPER, Circuit Judge, dissenting.

Southgate L. Morison, of Baltimore, Md. (William A. Grimes and Ober, Williams, Grimes & Stinson, all of Baltimore, Md., on the brief), for appellant.

George W. P. Whip, of Baltimore, Md. (Lord & Whip, of Baltimore Md., on the brief) for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal by the Isthmian Steamship Company, owner of the Steamship Ensley City, from a decree in admiralty holding it liable for damages to a cargo of licorice extract. The facts are fully set forth in the opinion of the District Judge, 71 F.Supp. 444, and need not be repeated here. The holding as to liability on the part of the steamship company was based on a finding that the cargo was improperly stowed in the vessel and that, although it was not in good condition when loaded, its condition was made worse by the improper stowage, with resultant damage to the cargo owner. It is contended on appeal that the damage to the cargo was due to its condition when loaded and not to negligent stowage and that, at all events, the cargo owner cannot recover because he has not proven that the cargo was in good condition when loaded.

We do not think that upon the record before us we would be justified in disturbing the finding by the District Judge that the cargo was damaged as the result of improper stowage. The question is a pure question of fact, and the findings of the judge are amply supported by the testimony of witnesses whom he saw and the value of whose testimony he was in better position than this Court to appraise. The temperature records of prior voyages, which were excluded by the trial judge, might very well have been admitted in evidence; but, since the conditions were not shown to be the same, they have but little probative value on the issues before the Court. We have permitted the taking of additional evidence as to the shipment of licorice extract on the steamship Nonsuco; but, instead of weakening, this has confirmed the conclusion arrived at on the original evidence. Although the extract loaded on the Nonsuco was in just such condition as that loaded on the Ensley City at the time of loading, it was in much better condition than that on the Ensley City at the port of discharge; and since the conditions of the voyage were substantially similar, it is a fair inference that the shipment on the Nonsuco arrived in better condition because it was properly stowed.

It is true that upon the arrival of the Nonsuco, the licorice was in such condition that the boxes had to be pried apart with crowbars; but it could still be treated as box cargo and could be unloaded with slings. In the case of the Ensley City, the boxes had gone to pieces and the licorice had fused into a solid mass so that it was necessary to break it up with pickaxes and chipping hammers, shovel it out of the vessel and recondition it at quite considerable expense. Its condition upon arrival, we think, was manifestly much worse than that of the cargo of the Nonsuco and was due to negligence in storing the licorice in

the tween decks of the vessel, next to the engine room, when the evidence shows that the bulkhead was so hot that a man's hand could not be held against it, and in stacking the boxes eight or nine tiers high with bags of licorice on top of these and with no use of dunnage to provide ventilation. Evidence given in the deposition which we allowed to be taken shows that dunnage was used on the Nonsuco, that the stacks there were only four or five tiers high and that the cargo was stowed in the lower hold of the vessel, where the temperature was lower. The master of the Nonsuco testified that the boxes should not be stacked more than four or five tiers high, which corroborates the testimony of experts in the lower court, one of whom was an experienced Lloyd's surveyor, that the cargo of the Ensley City was not properly stowed. We think that the additional testimony, as well as that first taken, supports the conclusion that improper stowage resulted in damage to the licorice shipped on the Ensley City and that the findings of the trial judge to that effect should not be disturbed.

As to the other contention of appellant, i. e. that there can be no recovery because the cargo was not shown to be in good condition when delivered to the vessel, the answer is that this is no defense when the evidence shows, as it does here, that the cargo was in worse condition when delivered by the vessel than when received, and that this deterioration in condition was due to negligent stowage. Liability for damage due to negligent handling or stowage of cargo may not be avoided merely because the cargo was not in good condition when accepted or was of a character to sustain damage if not handled properly. The fact that damage to goods arises out of their inherent nature constitutes no defense to the carrier if it appears that the damage would not have occurred but for the carrier's negligence. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; Bank Line v. Porter, 4 Cir., 25 F.2d 843; The Nichiyo Maru, 4 Cir. 89 F.2d 539. Of course, in making the assessment of damages in this case, nothing should be allowed for such portion of the loss as would have occurred because of the nature of the cargo or its condition when received, without negligence on the part of the carrier, but only for the part of the loss that may properly be attributed to the carrier's negligence.

Affirmed.

SOPER, Circuit Judge (dissenting).

The findings of fact by the District Judge in this case cannot be accorded the weight usually attributed to such findings, because the appellant was authorized by this court to present additional evidence which is now before us. This testimony relates to a shipment of 990 cases and 380 bags of licorice extract from Basra, which originated in the same factory in Turkey, and was similar in all respects to the licorice carried on the Ensley City. This additional shipment was placed on the Nonsuco, a vessel of different ownership, at Basra in the latter part of June, 1942, and was discharged at Staten Island, New York, in September, 1942. The merchandise was stored in the lower hold, the coolest part of the ship. Consequently the evidence as to the condition in which it arrived is important for purposes of comparison since the libellant's case is based entirely on the contention that if its shipment had been similarly stored in the lower hold of the Ensley City, the damage would not have occurred. I cannot agree with the finding stated in the opinion of the court that the new testimony, instead of weakening, has confirmed the conclusion arrived at on the original evidence.

During the trial the District Judge referred to the Nonsuco shipment, and complained that he was not given the benefit of testimony as to the condition in which the shipment arrived in this country; and in his opinion the judge stated that it was very significant that the appellant introduced no evidence in this respect. This testimony has now been taken and it demonstrates clearly that the condition of the goods was such that, although stored in the hold of the Nonsuco, they arrived in this country in substantially the same condition as the goods on the Ensley City which were placed in tween decks. The temperature at Basra, when the licorice was placed on the Nonsuco, like the tempera-

ture at the time of the shipment on the Ensley City, was between 110 and 115 degrees Fahrenheit. In consequence the licorice, which melts at this temperature, was oozing out of the cases and the swelling burst the cases so that the licorice was almost merged into a single mass. The master objected to the loading of the goods in this condition, but was finally prevailed upon to take them because of war conditions. When the ship arrived in New York the cases were smashed and merged together, so that it was necessary for the longshoremen to use crowbars to pry the mass apart in pieces of such size that it could be placed in the sling and discharged from the vessel. Because of its condition, according to the testimony of the only witness, the licorice could not be removed case by case, but was pried apart in pieces of the size of 2½ cases. He said that the congealed mass contained the remains of the cases, the nails and of course dirt; and that the licorice stored in the bags was full of the fibers from the bagging. It appears that the master of the Nonsuco failed to note on the bills of lading the poor condition of the shipment at Basra, and that substantial damages were paid to the shipper on account of the poor condition of the goods upon arrival.

The condition of the licorice on the Ensley City, when it was shipped and when it arrived in Baltimore, was quite similar to that on the Nonsuco described above. Although some attempt was made to repair faulty cases before placing them on the Ensley City at Basra, the licorice, due to the high temperature, was in a molten state, bursting out of the cases, and the result was that when lower temperatures were met during the voyage, the material hardened and coalesced. It expanded, smashing the cases and the bags in which it was stored, so that the goods were fused together in one mass when the goods arrived in Baltimore. At first an attempt was made to remove the licorice by means of picks and shovels, using the ship's gear, and about half the licorice was removed by this means. But this proved unsatisfactory and the remainder was removed by means of air chipping hammers. Thereafter it was necessary to remove the wood-

en portions of the smashed cases, the nails and the bags from the licorice mass, as was the case of the goods shipped on the Nonsuco.

That the condition of the goods on the Ensley City, upon arrival, was not due to the higher temperature of the tween decks, or to the manner in which the goods were stored, is shown by the similar condition upon arrival of the goods carried by the Nonsuco on which vessel the licorice was stored in the lower hold and was piled only four or five tiers high with dunnage between the cases. The evidence indicates that these changes in the method of handling the merchandise did not materially change the condition of the goods on arrival. The difference in temperature between the tween decks and the lower hold of the Ensley City was in fact not very great. Too much weight has been given to the statement of a surveyor employed by the libellant as an expert witness that the wall between the engine room and the tween decks was so hot that a man could not hold his hand against it. Regard should rather have been given to the fact that the engine room crew had no difficulty in performing their duties in the engine room, which was situated between the tween decks and the boilers, and that the actual thermometric records of other voyages under similar conditions showed that the temperature difference was never more than ten degrees and was usually not in excess of five degrees. Temperature readings could not be taken on the voyage in question as the space below deck was covered in order to meet war conditions. The expert testimony that the goods were piled too high on the Ensley City was completely overcome by the testimony of the manufacturer of the licorice, a witness for libellant, who said that it was customary in the warehouse in Turkey to pile the cases ten feet high, without any dunnage between them.

It is obvious that the conditions on the two vessels were quite similar, and there seems to be no reasonable ground to hold that the poor condition in which the goods on the Ensley City were delivered was due to the fact that they were stored in the tween decks rather than in the lower hold.

The plain fact is that in both shipments the damage was done when the goods were placed on board in defective cases at a temperature so high that the licorice was melting and the cases were merging together. Subsequently, when lower temperatures were encountered at sea, the licorice solidified in almost a solid mass, and the only effect of placing them in a lower hold of the Ensley City would have been to expedite this hardening process.

The final decision as to liability in this case might well await the taking of testimony as to the additional cost of discharging and reconditioning the goods on the Ensley City, because it is conceded that the ship is liable only for so much of the damage as was caused by placing them in the tween decks instead of in the lower hold. The total damage could then be compared with that which was suffered on the Nonsuco, and the court would have persuasive proof as to whether storage in the tween decks materially added to the loss and if so, how much.