CRAMP SHIPBUILDING CO. v. LUCK-
ENBACH S. S. CO., Inc. et al.
The J. L. LUCKENBACH.

No. 10117.

United States Court of Appeals
Third Circuit.

Argued April 6, 1950.

Decided May 16, 1950.

Lewis H. Van Dusen, Jr., Philadelphia, Pa. (Henry S. Drinker, Drinker, Biddle & Reath, Philadelphia, Pa., Samuel B. Fortenbaugh, Jr., Philadelphia, Pa., on the brief), for appellant.

John C. Donovan, Washington, D. C. (Gerald A. Gleeson, United States Attorney, Philadelphia, Pa., J. Frank Staley, Special Assistant to the Attorney General, James P. McCormick, Assistant United States Attorney, Philadelphia, Pa., John T. Casey, Washington, D. C., on the brief), for appellee United States.

Thomas E. Byrne, Jr., Philadelphia, Pa. (Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for Luckenbach S. S. Co., Inc.

Before BIGGS, Chief Judge and GOODRICH and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

This appeal in admiralty raises the question of the responsibility of the Luckenbach Steamship Company or the United States, or both, for paying $13,878 to the libellant, Cramp Shipbuilding Company. The charge is for the repair of 3,965 rivet holes and the price is agreed to be reasonable. It is agreed likewise that the work has been done and done satisfactorily. The question is who shall bear the costs.

The ship, "J. L. Luckenbach," was taken over by the United States and used during World War II. The agreement between the owner and the United States was that the ship was to be returned to the owner in at least the same condition as it was when taken, less ordinary wear and tear. When the war was over and the ship was to be returned to its owner the vessel was drydocked in Brooklyn. The owner's representative went over the vessel and made up a long list of items for repair in preparation for the return of the vessel to the owner in accordance with the contract. The owner was also permitted to include in the list of repairs to be made certain things which it desired in addition to that which the United States was obligated to do. These were paid for separately by the owner and do not concern us here. While the vessel was in Brooklyn representatives

of the companies seeking to bid for the repair job were privileged to inspect it. Cramp did not do so but could have done so had it desired.

Cramp was the successful bidder. The ship was brought to the Cramp yards in Philadelphia and was worked upon in both the wet- and the drydock. Cramp has been paid $78,000 by the United States and $18,000 by Luckenbach for work done. All that is now out of the picture. The only thing subject to dispute at this point is the $13,878 item for the repair of rivet holes already mentioned.

■ The trial court denied recovery. This is an admiralty case and, of course, we are not as closely bound to the trial court's determination as we are in litigation governed by the Federal Rules of Civil Procedure, especially Rule 52(a), 28 U.S.C.A. Nevertheless, where the question is one of determining the probabilities among conflicting lines of testimony, the trial court's determination is to be given considerable weight, especially when witnesses appeared in court.[1]

Under the contract, Cramp was to remove certain damaged metal plates from the hull of the vessel. Some of these were to be "faired in place and reriveted" and others were to be "renewed." The distinction obviously is due to the fact that some plates were damaged more seriously than others. It appears from the testimony that the "Luckenbach" had suffered two collisions in a tidal wave while in Manila Harbor during the war. The injured plates were caused by these misfortunes.

When the plates were removed in accordance with the contract it was discovered that rivet holes in adjoining plates, which were overlapped by the plates removed, were elongated. It was necessary that these elongated rivet holes be puddled in and the plates rereamed to receive new rivets in order that the ship would qualify for its class rating. This was done.

The record is full of contradictory testimony concerning the cause of the elonga-

tion of these rivet holes. One witness laid it to the original construction of the ship, a theory which none of the parties care to sponsor. The respondents urge that the elongation was due to the negligence of Cramp's employees in removing the rivets from the plates which were to be taken down and repaired or replaced. The trial judge found that some of the damage was due to Cramp's negligence. He did not say how much and we see nothing in the record which would help him decide how much. He found, also, that some of the elongated rivet holes had come from a strain on the plates at the time of the collisions and that some came from causes which could not be determined. The libellant concedes that it cannot recover for the cost of repairing rivet holes which were put in need of repair by the carelessness of its own employees. But it says as to the cost of the other parts of the job that it should not bear it, that it did not contract to produce a result like putting a ship into generally seaworthy condition. It undertook to do certain specified repairs for certain specified sums and puddling in elongated rivet holes was not one of the specified repairs, it says. It points to several circumstances which it says show that the parties regarded this rivet job as a new and separate one for which extra compensation should be paid. The first of these is the work order that was given following the discovery of the elongated holes. The work order read: "weld up elongated rivet holes in all old plates as instructed by the owner's representative." But this is simply Cramp's supervisory authority talking to Cramp's operating people. The fact that both the respondents received copies of the order does not prove anything to establish the liability of respondents.

The appellant urges, with considerable earnestness, that when the parties had redrilling in mind they specified it. There is one item, No. 0272, regarding an M-9 plate. This plate was to be taken down and renewed as an extra item because it could

1. Isthmian S. S. Co. v. Martin, 4 Cir., 1948, 170 F.2d 25; The C. W. Crane, 2 Cir., 1946, 155 F.2d 940; The S. S. Bellatrix, 3 Cir., 1940, 114 F.2d 1004.

not be faired in place, and it was specifically provided that elongated rivet holes were to be puddled in and redrilled. But the language used with reference to this M-9 plate is totally without significance here. The specifications for it were prepared on August 15, 1946, which was three days after a work order had been issued to puddle and ream the damaged holes in dispute here. By then the elongated holes elsewhere had been discovered and responsibility for the damage and its repair had been the subject of heated discussion. The M-9 language casts no light at all upon what the parties had in mind when the contract was executed.

Appellant also makes the point that Baumgartner, Luckenbach's agent, certified to the completion of the work after it was done and stated in the certificate that certain items which were designated by number, including the one in question here, had been authorized by him. To us, however, this falls short of an admission that he had contracted Luckenbach into liability for the job. There is plenty of testimony that these elongated holes had caused heated discussion. Baumgartner indicated his dissatisfaction with the work that had created these damaged rivet holes. His position at the time was that they were the fault of Cramp's workmen. If Mr. Steen, then manager of Cramp's yard, had a different theory about it we have not had the benefit of his testimony, for he was not called.

We do not see how the cost of repairing these rivet holes can be called a new item for which respondents must pay. Of course, they do not need to pay for expense caused by the negligence of the contractor's own workmen. As to the other elongated rivet holes, the contractor certainly knew that here was a ship which had been through the war. There could have been as much inspection as it cared to make at the time bids were invited. Certainly Cramp did not intend to take down, repair and replace plates only to rivet them back through elongated rivet holes. If the expense of making the rivet holes right was greater than the contractor anticipated, that is one of the risks of undertaking such a job. There was no supervening impossibility. The most that happened was that the job turned out to be a harder one than the contractor thought when he made his bid.

The decree of the District Court will be affirmed.