**WILMAR MARINE ENGINEERING &
SALES CORPORATION**

v.

M/V PERSEO, her engines, boilers, apparel, etc., and Sicular Oceanica, S. A.

No. 817.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Dec. 27, 1967.

Henry J. Read, Montgomery, Barnett, Brown & Read, New Orleans, La., for libelant.

Alfred M. Farrell, Jr., Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for cross-claimant defendant, Sicula Oceanica, S. A.

WEST, Chief Judge:

Libelant, Wilmar Marine Engineering & Sales Corporation, brings this suit to recover for work allegedly performed by it in connection with the cleaning of the tanks of the M/V PERSEO, a vessel owned and operated by respondent, Sicula Oceanica, S.A., hereafter called Siosa. Respondent, Siosa, answered, denying owing libelant anything, basing its denial on an alleged breach of contract by Wilmar, and then counterclaiming against Wilmar for damages allegedly resulting from the breach of contract. After reviewing the extensive record in this case, the Court concludes that Wilmar is entitled to recover from respondent the total sum of $46,764.41, and in connection with this conclusion makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.

At all times pertinent hereto, libelant, Wilmar Marine Engineering & Sales Corporation, hereafter referred to as Wilmar, was a corporation organized pursuant to the laws of the State of Louisiana with its principal place of business being located at Arabi, Louisiana.

**2.**

At all times pertinent hereto, the respondent, Sicula Oceanica, S.A., hereafter referred to as Siosa, was a foreign corporation organized under the laws of Italy, with its principal place of business being located in Genoa, Italy, and was, at all times pertinent hereto, the owner and operator of the M/V PERSEO.

**3.**

The M/V PERSEO is an ocean-going merchant vessel of 9493 net tons with a carrying capacity of approximately 23,-000 tons. She is compartmented into 27 compartments or tanks, arranged three abreast with the nine center tanks measuring about 40 feet square by 45 feet deep, and the nine port and nine starboard tanks measuring each about 40 feet long, 20 feet wide, and 45 feet deep.

**4.**

On March 12, 1965, while the PERSEO was discharging a cargo of oil in Belgium, her owner, Siosa, entered into a charter party with Tradex Export, S.A., the time charterer, pursuant to which the PERSEO was to make three voyages carrying grain out of United States gulf ports. Baton Rouge, Louisiana, was nominated as the first port at which a cargo of grain was to be loaded aboard. The charter party provided that the PERSEO was to be inspected and approved by the proper officials at the loading port for hauling of grain on or before 12:00 o'clock noon on April 8, 1965, and if this condition was not met, the charterer had the option of cancelling the entire contract.

**5.**

In order to obtain the approval of the inspectors for hauling grain in the PERSEO, it was necessary that all of her tanks be properly cleaned and made free of any oil residue to avoid contamination of the grain by the residue of the previous cargo of petroleum products. In order to accomplish this by the time the vessel was due to arrive in Baton Rouge, Siosa intended to have the ship's crew, under the supervision of Mr. Christiansen, a technician brought aboard for the purpose, clean the tanks while en route from Europe to Baton Rouge by a process known as butterworthing. This is a cleaning process that requires the use of water and chemicals applied under pressure by use of specially designed nozzles and hose connectors.

**6.**

While it was expected that the tanks could be adequately cleaned by this process before the vessel reached Baton Rouge, such was not the case. Bad weather was encountered on the crossing and other difficulties, such as clogged condenser pipes, inadequate number of "butterworthing holes," and difficulty in obtaining water of the proper temperature. All of these difficulties combined to defeat the efforts of the crew to complete the butterworthing process on time. The vessel was diverted to Bermuda for the installation of new condenser pipes where it remained for 48 hours before proceeding to New Orleans, Louisiana. What was begun as a more or less routine cleaning job turned out to be a rather complicated and extensive undertaking.

**7.**

When the PERSEO arrived at Pilottown, below New Orleans, Louisiana, on April 6, 1965, Dr. Aldo Grimaldi, a director and representative of Siosa, came aboard. After checking on the progress of the tank cleaning, he realized that there was much more to be done than could be accomplished by the ship's crew in the short time remaining before April 8, so he decided to employ the services of a tank cleaning firm to complete the job. When the vessel arrived at New Orleans, a Mr. Peterson, the head of a tank cleaning firm, came aboard. After discussing the job with Grimaldi, he, Peterson, decided he could not complete the job by April 8. He further indicated that the job might cost as much as $50,000—a figure which Grimaldi held "to be completely fair."

**8.**

When Peterson refused to do the job, Grimaldi realized the impossibility of meeting the April 8 deadline so he arranged with the charterer, Tradex, for an extension of seven days, or until noon, April 15. After this extension was obtained, Grimaldi contacted plaintiff Wilmar sometime during the night of April 6, or early morning of April 7, and the following contract was entered into:

"April 7, 1965

"We propose to clean M/T PERSEO to load a cargo of corn. We will clean center tanks # 1–9 and port and starboard tanks 1–9 to be cleaned to the satisfaction of the National Cargo Bureau and the Board of Trade Inspectors.

"Work will be performed at the regular rate of $4.20 per man hour. Work will probably be completed by Monday night midnight April 12th. Anyway vessel must be in Baton Rouge by 12 noon on April 13th. Normal overtime rate will be charged if necessary.

"*Terms*: 75% of invoice to be paid on securing of certificate of readiness from National Cargo Bureau and Board of Trade Inspectors.

"Maximum price for cleaning vessel will be $31,000.00 (Thirty One Thousand Dollars).

(Signed)                    (Signed)

"Aldo Grimaldi            Raymond Willhoft
                          Wilmar Marine Engineering"

---

**9.**

On April 7, prior to executing this contract, Mr. Raymond George Willhoft, Secretary-Treasurer of Wilmar, boarded the PERSEO pursuant to Grimaldi's request conveyed to him by telephone call from one Mr. Piccolo, who was acting as translator, and upon this first visit, when asked by Grimaldi to give a firm bid for doing the work, refused to do so and left the ship. Later in the day, upon being asked to return to the ship, Willhoft did so, and after discussing the matter with Grimaldi and Christiansen, he agreed to do the job on a "time and material basis" using $4.20 an hour as a man-hour cost. When Grimaldi insisted that a maximum figure be agreed upon, the contract appearing in Finding No. 8 was executed.

**10.**

When the contract was entered into Wilmar, through its representative Willhoft, was given to understand that the vessel had been completely butterworthed and that nothing remained to be done but to clean out the residue left after butterworthing has been completed. Wilmar was not advised of the fact that the butterworthing had not, in fact, been completed and that much more than a "clean-up" job was involved. It seems fair to conclude from all of the evidence in the case that at the time of signing the contract of April 7, neither Wilmar nor Grimaldi were aware of the fact that the tanks had not been properly butterworthed and that instead of petroleum residues remaining merely at or near the bottom of the tanks as would normally have been the case had the

butterworthing process been properly completed, the complete inside of the tanks still contained petroleum residues which had to be cleaned off. That such was, in fact, the condition of the tanks is evident from the fact that later Grimaldi hired the Maritec Company to re-butterworth the tanks which both he and Wilmar had thought, at the time of executing the contract, had already been adequately butterworthed. Wilmar was never expected to do any butterworthing. Both parties knew that Wilmar was not equipped to do so. Both parties to the contract thought that the clean-up job only required Wilmar to remove the residue from the lower part and bottom of the tanks by scraping and wiping and possibly removing loose residue in buckets, and that is all the parties expected that Wilmar would be required to do pursuant to the contract.

## 11.

Wilmar's crews began working on the tanks on April 7, and soon after they commenced work it became apparent that the scope of work necessary to properly clean the tanks was far greater than had been anticipated by either party to the contract. Workers were required to clean the upper parts as well as the lower portions of the bulkheads by use of ladders; a further use of chemicals was required and it soon became obvious that further butterworthing was necessary in order to properly clean the tanks. To do this latter job, Grimaldi ultimately hired the Maritec Company.

## 12.

On April 11, James Ryan, President of Wilmar, who had been out of the city, arrived home and went aboard the PERSEO. He immediately recognized the fact that the actual cost to Wilmar of cleaning the tanks of the vessel would greatly exceed the $31,000 set as a maximum in the contract. He informed Grimaldi that his company had already expended the sum of $36,000, and that it could not complete the contract on the terms originally agreed upon. Whereupon Grimaldi stated that he was aware of that fact and he further stated that according to his records, Wilmar had actually expended the sum of $36,100. Grimaldi then requested Wilmar to continue with the work with the understanding that Siosa would pay to Wilmar all of the actual costs of labor and materials incurred by Wilmar in completing the job. Grimaldi made it plain that Wilmar would not be paid a profit on the job, but that it would be paid all of the actual expenses of labor and material incurred in completing the job. This agreement, orally entered into on April 11, was acceptable to both parties. There is no question but that no top limit of any kind was agreed upon when this oral agreement was entered into on April 11.

## 13.

Had the job been completed to the satisfaction of the inspectors by midnight April 12, as seems to have been contemplated by the original contract of April 7, there would, in all probability, have been no dispute between the parties concerning the actual cost of labor and materials involved in the job.

## 14.

Work continued on the tanks on an around-the-clock basis, and on April 13, the vessel moved up river from New Orleans to Baton Rouge in order to be available for inspection on April 14. It was inspected on the morning of April 14 and the job was rejected as not complete by the inspectors for both the National Cargo Bureau and the Baton Rouge Port Commission. Grimaldi requested the inspectors to re-inspect the following morning, April 15, which was the deadline set by the charterer for acceptance of the vessel. Wilmar's men worked the entire night of April 14, and on April 15, the inspector for the National Cargo Bureau again rejected the job while the inspector for the Baton Rouge Port Commission apparently was at least partially

satisfied with it. Grimaldi thought the inspector for the National Cargo Bureau was being "extremely strict."

### 15.

Realizing that the deadline of April 15 could not be met, Grimaldi obtained another extension of time from the charterer to April 22. This extension, however, was conditioned upon a reduction in the freight rate of 20 cents per ton for the first voyage. It was at this time, after the rejection on April 15, that Grimaldi realized that the tanks really needed additional butterworthing and he then employed the services of Maritec Company to do that work. As a matter of fact it was Inspector Battcock of the National Cargo Bureau who suggested to Grimaldi that additional butterworthing seemed to be needed.

### 16.

After the rejection on April 15, and after Maritec had been employed, Grimaldi, on behalf of Siosa, and without the slightest suggestion that he considered the original or supplemental contract to have been breached, again requested Wilmar to continue to work along with Maritec to see if the work could be completed by the new deadline of April 22. Wilmar did continue to work on the tanks, and on April 22, the vessel was again tendered for inspection. The inspector for the Baton Rouge Port Commission approved the job, but the inspector for the National Cargo Bureau, Mr. Battcock, once again refused to approve it.

### 17.

At the termination of the second shift on April 21, and prior to the inspection of April 22, the Wilmar crew had left the vessel to await the outcome of the inspection. On April 23, after the rejection by Battcock, Grimaldi, who had returned to Genoa, Italy, cabled Wilmar asking it to have its crew return to the vessel "for completing work and obtain soonest acceptance all tanks by NCB surveyor." There was still no suggestion by Grimaldi that he considered either the contract of April 7 or the supplemental agreements to have been breached by Wilmar. In an attempt to comply with instructions contained in this cable, Wilmar sent its crew back to the PERSEO but upon arriving there they were rejected by the ship's master, Capt. Monti, and not permitted to board the vessel. Despite Grimaldi's cable, Monti had already contracted with Mr. Piccolo, a representative of a ship chandler, for the hire of some workers that he, Piccolo, could make available. These men, together with the ship's crew, completed the job and the vessel was finally approved by Battcock on April 27. The charterer had not exercised its option to cancel, and consequently the PERSEO proceeded to load grain and perform according to the charter party as amended.

### 18.

Wilmar now demands of Siosa the amount of its actual costs for labor and materials as per the agreement of April 11. Siosa resists payment on the grounds that the payment of actual costs of labor and materials, as opposed to the original $31,000 ceiling was conditioned on Wilmar's meeting the deadline of April 12 contained in the original agreement of April 7. This is really the only issue of any importance involved. Wilmar contends that the supplemental oral contract of April 11, by which Grimaldi agreed to pay costs in excess of the April 7 contract price, was not conditioned upon completion of the job by April 12. Siosa, on the other hand, contends that its supplemental agreement of April 11, whereby it agreed to pay actual labor and material costs in excess of the ceiling stated in the original contract, was conditioned upon the completion of the cleaning job to the satisfaction of the inspectors for both the National Cargo Bureau and the Baton Rouge Port Commission not later than the original deadline of April 12. The Court finds, as a fact, that Siosa's sup-

plemental agreement of April 11 was not conditioned upon completion of the job by the original completion date of April 12. The new agreement of April 11 simply recognized the fact that both parties to the April 7 contract had been laboring under a mutual gross mistake of fact, and in an effort to correct this mutual error, simply required Wilmar to proceed with the cleaning job on an actual cost of labor and material basis, and to complete the job as soon as possible. The Court finds that since on April 11, both parties realized for the first time that the job was much more extensive than had originally been contemplated, they must certainly have also realized that it would be virtually impossible to complete the job by the original completion date of April 12. Common sense seems to dictate this conclusion. The condition of the tanks on April 11 clearly indicated that the cleaning could not possibly be completed in one additional day. It is simply not reasonable to conclude that Wilmar, who was already losing money on the job, would have agreed to expend substantial additional funds to try to complete the job if a condition for receiving payment of even its bare costs was the obviously impossible condition of completing the job by April 12. The Court therefore finds, as a fact, that Siosa did not condition its supplemental agreement of April 11 upon the completion of the job by the original completion date of April 12.

19.

■ The Court further finds, as a fact, that Wilmar never did complete the job to the satisfaction of the inspectors for both the National Cargo Bureau and the Baton Rouge Port Commission but that as of the date of April 23, when Wilmar's crew was refused permission to board the vessel to continue their work on the tanks, Wilmar had expended in actual cost to it for labor, transportation, and materials, in connection with the tank cleaning job, the sum of $60,824.41.

20.

■ The Court further finds, as a fact, that it was the intention of the parties, as evidenced by the oral agreement of April 11, that Wilmar would be paid by Siosa these actual costs for labor and material and that it was intended that these costs would necessarily include the item of transportation, F.I.C.A., Insurance, and State Unemployment, but would not include such regular recurring costs as shop overhead and use of Wilmar's equipment. The purpose of the agreement was to reimburse Wilmar for actual out-of-pocket expenses incurred in paying for the labor and materials actually used aboard the PERSEO in cleaning the tanks and nothing else.

21.

While it is true that Wilmar did not finish the job as contemplated by the parties, nevertheless, there is no showing in this record that the amounts expended by plaintiff for labor and materials for the work actually performed were excessive or that such expenditures would not have been incurred by Siosa during the cleaning of the tanks whether the work had been performed entirely by Wilmar or partially by Wilmar and partially by someone else. Nor is there any reason to conclude from the record that had Wilmar been allowed to complete the job, the total cost to Siosa would have been any more or less than was actually incurred.

22.

■ The Court further finds as a fact that the expenses, totaling $51,045.91 claimed by Siosa to have been incurred as a result of Wilmar's breach of contract were not so incurred. It is the opinion of this Court that these expenses, as itemized by defendant, were expenses that would have been incurred by Siosa whether Wilmar had ultimately completed the job or whether Maritec or someone else had completed it. The alleged damages resulting from detention of the vessel

and the reduction in freight rates, comprising some $26,803.76 of the above amount claimed by defendant, were not, in the opinion of this Court, incurred as a result of any breach of contract on the part of Wilmar. The delays encountered in the cleaning of the tanks were due to the condition of the tanks themselves, and to a mutual misunderstanding or mistake of fact made by both Siosa and Wilmar concerning the condition of those tanks. The remainder of the damages claimed by Siosa were expenses that would have been incurred had Wilmar been permitted to complete the job and had it been thus completed in the same length of time that was taken by those who followed Wilmar on the job.

23.

On April 9, 1965, Siosa authorized the payment to Wilmar of the sum of $20,000 to be applied against the $31,000 figure set as the ceiling in the contract of April 7. This amount was actually paid to Wilmar on April 12. Since the Court finds that in view of the oral contract of April 11, the $31,000 ceiling contained in the April 7 agreement becomes meaningless, the said $20,000 payment received by Wilmar must be set off against the total amount due Wilmar for labor and materials actually used on the job.

24.

■ In addition to the amounts claimed by plaintiff as being due for cleaning the tanks on the PERSEO, Wilmar also seeks to recover the sum of $10,520, representing the cost of fabricating and installing aboard the PERSEO twenty-seven roseboxes and twenty-seven sounding pipes. There is no dispute about the fact that Wilmar contracted with Siosa to do this work for a total sum of $5,940, nor is there any dispute about the fact that Wilmar sub-contracted this work to Champion Machine Works, Inc. and ultimately paid them $10,520 to do the job. But Wilmar contends that since its actual cost for this work was $10,520, it should recover that amount instead of $5,940, the figure contained in the contract. Wilmar points again to the April 11 oral

agreement to justify this claim. The Court cannot agree with this contention. The April 7 written agreement pertained only to cleaning the tanks. The April 11 oral agreement altered only that agreement. The contract involving the roseboxes and sounding pipes was a separate, distinct contract and it was never altered by the parties. Wilmar agreed to do the work for $5,940, and no change in that agreement was ever made by the parties thereto. Siosa never agreed to pay actual cost of labor and material on that job as it did on the tank cleaning job. Siosa agreed to pay only $5,940, and Wilmar agreed to do the job for that amount. That is all that Wilmar is now entitled to recover for the fabrication and installation of the roseboxes and sounding pipes.

CONCLUSIONS OF LAW

1.

The subject matter of this litigation is within the admiralty and maritime jurisdiction of this Court, and venue is properly laid in the Baton Rouge Division of the Eastern District of Louisiana. 28 U.S.C.A. § 1333.

2.

■ The Court having found, as a matter of fact, that the contract entered into between Wilmar and Siosa on April 7, 1965, was based upon a mutual mistake of fact concerning the condition of the tanks of the M/V PERSEO, the Court now finds as a matter of law that Wilmar had the right, if it wished to exercise it, to recede from that contract when the mistake was discovered, and that when Siosa, recognizing this right, entered into a new oral contract with Wilmar on April 11, 1965, it did, as a matter of law, receive adequate consideration for that new contract. Lee v. National Cylinder Gas Co., La.App., 58 So.2d 568 (1952). The cases cited by defendant in opposition to this conclusion can be easily distinguished from the present case. For example, defendant cites The President Roosevelt, 116 F.2d 420 (CA 2—1940). In that case, however, there was no rep-

resentation made by the shipowner to the contractor that the "reverse bars" of the ship were not in need of replacing. As the work progressed it was found necessary to replace these reverse bars and the Court held that the contractor was liable for that work. However, in the present case the evidence clearly shows that there was, in fact, an affirmative representation made by Siosa that the tanks of this vessel PERSEO had been completely butterworthed on the voyage from Europe, and that the tanks were thus ready for the final cleaning up, the only job which Wilmar actually contracted for. Defendant also cites Cramp Shipbuilding Company v. Luckenbach S. S. Company, 181 F.2d 939 (CA 3—1950). While this case, at first blush, seems to be in point, nevertheless, there is an important distinction. While neither of the parties to the contract in that case apparently knew of the elongated rivet holes that would require fixing, nevertheless the shipowner did not represent to the contractor that there were no elongated rivet holes. This case is distinguishable from the present case on the same grounds that *The President Roosevelt* is distinguishable, i. e., in the present case an affirmative representation was made to the contractor that certain conditions existed which did not, in fact, exist. Wilmar relied upon those representations.

### 3.

Under the terms of the oral contract of April 11, 1965, which contract became the law as between the parties, Siosa obligated itself to pay to Wilmar the actual cost of labor and materials expended in connection with the cleaning of the tanks of the M/V PERSEO. Thus the measure of the amount recoverable by Wilmar is the amount of money actually expended by Wilmar for labor and materials in the cleaning of the tanks, so long as that amount is not shown to be unreasonable. United Steel Company v. Casey, 262 F. 889 (CA 6— 1920); Lee v. National Cylinder Gas Company, supra; Wendel v. Maybury, La.App., 75 So.2d 379 at 383 (1954). The April 11 agreement between Wilmar

and Siosa did not provide for payment to Wilmar on a quantum meruit basis. It specifically provided for payment to Wilmar of its actual cost of labor and material in connection with the cleaning work done or to be done on the tanks of the PERSEO by Wilmar.

### 4.

While the defendant correctly states that the performance of a contract may be conditioned upon the approval of the work by a third party, and that it may be conditioned on being completed within a certain time, the fact remains that the agreement of April 11, 1965, was not so conditioned upon approval by a third party or upon completion within a certain time. When the parties to this agreement realized, on April 11, 1965, that the tanks had not been cleaned as previously represented by Siosa, the oral agreement of that date completely superseded the contract of April 7, 1965, and simply obligated Wilmar to proceed as best it could to clean the tanks, and obligated Siosa to pay for those services on a cost of labor and material basis, with no profit to be realized by Wilmar. Therefore, the Court further finds as a matter of law that the promise of Siosa to pay to Wilmar the reasonable cost of labor and material expended or to be expended by Wilmar in connection with the cleaning of the tanks of the PERSEO was not conditioned upon Wilmar completing the job by a certain date, nor was it conditioned upon Wilmar completing the job at all. While it was obviously hoped by both parties that Wilmar would be able to complete the job and obtain the necessary approvals, nevertheless, the promise of reimbursement of cost of labor and material was not conditioned upon completion of the job. Indeed, Siosa, by finally refusing permission of Wilmar's men to come aboard to finish the job made completion of the job by Wilmar impossible. Absent a showing that the charges made by Wilmar for its cost of labor and materials furnished for actual work performed on the tanks of the PERSEO was unreasonable, Siosa, by the terms of the oral contract of

**354**

April 11, 1965, is indebted to Wilmar for such costs. And the Court concludes, as a matter of law, that the sum of $60,-824.41, representing the cost to Wilmar for labor and materials actually used by it in cleaning the tanks of the PERSEO, is a reasonable charge for that work.

5.

Since the Court has found, as a matter of fact, that Siosa received the full value of the work performed by Wilmar on the tanks of the PERSEO, and since the Court finds, as a matter of fact, that the charges made by Wilmar for those services were only the reasonable costs thereof, as contemplated by the agreement of April 11, 1965, the Court now finds, as a matter of law, that the defendant Siosa is indebted to the plaintiff Wilmar for the actual cost of labor and material used in connection with cleaning the tanks of the PERSEO in the sum of $60,824.41, less the sum of $20,000.00 previously paid, or a net amount of $40,-824.41.

6.

The Court further finds as a matter of law that Siosa is also indebted to Wilmar for the sum of $5,940.00, representing the contract price agreed upon for the fabrication and installation of the rose-boxes and sounding pipes aboard the M/V PERSEO.

7.

The Court having found, as a matter of fact, that the defendant Siosa did not sustain any damage as a result of a breach of contract on the part of Wilmar, Siosa's counterclaim for damages will, as a matter of law, be denied in its entirety.

8.

Plaintiff Wilmar is, as a matter of law, now entitled to recover from the defendant, Siosa, the total sum of $46,-764.41, together with interest and costs according to law.

Judgment will be entered accordingly.