IRON CITY SAND & GRAVEL DIVISION OF McDONOUGH CO., a corporation, Plaintiff,

v.

The WEST FORK TOWING CORPORATION, a corporation, and Anthony J. Pitrolo, Administrator of the Estate of Paul Pitrolo, Deceased, Defendants.

Civ. A. No. 1-67-F.

United States District Court
N. D. West Virginia,
Fairmont Division.

March 25, 1969.

Supplemental Opinion April 29, 1969.

Furbee, Amos, Webb & Critchfield, Fairmont, W. Va., Rose, Schmidt & Dixon, Pittsburgh, Pa., for plaintiff.

George W. May, Fairmont, W. Va., for defendants.

CHRISTIE, District Judge:

This is an action in admiralty brought by Iron City Sand & Gravel Division of McDonough Co. (hereinafter referred to as Iron City) against The West Fork Towing Corporation (hereinafter referred to as West Fork Towing) and Anthony J. Pitrolo, administrator of the estate of Paul Pitrolo, deceased, for the value of two barges which sank in the West Fork River on March 5, 1963. Pitrolo was president and principal stockholder of West Fork Towing. Iron City, the owner *pro hac vice* of the barges, bases its claim on negligence in securing the barges to a landing on the West Fork River and on the failure of West Fork Towing and Pitrolo to return the barges in a sound and seaworthy condition. West Fork Towing and Pitrolo's estate both deny liability for the loss, alleging as affirmative defenses that at the time of the delivery of the barges they were not in a seaworthy condition and that the loss was not caused by any negligence of the defendants but by Act of God. Additionally, Pitrolo's estate denies any individual liability and asserts that plaintiff must look solely to the corporate defendant for recovery in the event that liability is established. The Court, having heard the evidence, now makes its findings of fact and conclusions of law, and directs entry of its judgment as follows:

FINDINGS OF FACT

On February 8, 1963, the Mike Murphy, a vessel of West Fork Towing, arrived at the docks of Iron City on the Monongahela River, in Pittsburgh, Pennsylvania. The vessel had two barges in tow which were to be loaded with sand at Iron City's dock and returned to the Fairmont, West Virginia, landing, however, because of the cold weather, Iron City was not able to load the barges at that time. As a result, an agreement was worked out whereby West Fork Towing was to leave its two barges at Iron City's Pittsburgh landing, taking two loaded barges of Iron City in lieu thereof back to the Fairmont landing. Under this arrangement Iron City's two barges, designated I.C. 211 and I.C. 212, were to be returned by West Fork within a reasonable time after they had been unloaded. The two barges were of steel construction and were each 135 feet long, 27 feet wide and 7½ feet deep. The barges had a capacity of 500 tons each and when loaded normally had eighteen to twenty-four inches freeboard. The two barges were built in 1930 and, although there was some evidence of leakage, the evidence establishes that at the time of the delivery of possession of the barges to West Fork Towing they were in a seaworthy condition.

After towing the two barges to Fairmont, they were moored at West Fork's landing and remained there until the fifth of March, when they went adrift upon the river. West Fork Towing's landing consisted simply of a river bank into which twenty-five or thirty oil well casings had been sunk for the purpose of providing a mooring for its vessels. The sunken casings were ten inches in diameter and were filled with reinforcing rods and concrete. The casings extended from twenty-five to thirty feet down into the ground and cleared about two feet above the ground. Although Iron City alleges in its complaint that the landing was inadequately constructed, considering the size of the West Fork River and the size of West Fork Towing's operation, the evidence supports a finding that the landing was adequately designed and constructed.[1] Moreover, a representative of Iron City visited West Fork Towing's

---

1. Our finding in this respect is based, in part, upon testimony to the effect that landings similar in function to West Fork's were in general use by operations along the rivers performing essentially the same type and volume of work as West Fork.

landing site between the time the barges were moored there and before they went adrift. This visit was occasioned by Pitrolo's complaint as to the quality of the sand. Iron City's representative did not on this or any other occasion voice any objection or concern as to the manner in which the landing was constructed or the barges were moored.

West Fork Towing's landing is located on the right bank of the West Fork River approximately 2,000 feet from the point where the mouth of the West Fork River meets the mouth of the Tygart River to form the Monongahela River. The river is 200 feet wide at the landing and the navigable channel at that point is about 100 feet wide. From its source to its mouth the West Fork River flows in a northerly direction and, as finally moored, barges 211 and 212 were tied up to the south of West Fork Towing's landing with several other empty barges moored just north of them. The Mike Murphy was moored nearer the mouth of the West Fork River, just above the barges. Barges 211 and 212 were secured by the use of four $\frac{7}{8}$-inch steel cables which were tied to the steel casings or "deadheads" along the shore. The two barges were tied up parallel to the shore with the stern of the first barge secured to the bow of the second barge by the use of 2-inch hemp rope. Two of the steel cables were looped around the two timberheads on the shore side of the bow of the forward barge (the barge farther upriver from the mouth of the West Fork River), these cables being held in place by two 7-inch cable clamps. Two other steel cables were looped around the two timberheads on the shore side of the stern of the rear barge and these cables were similarly secured by the use of 7-inch cable clamps. Both the steel cables and the hemp rope were new and the evidence indicated that they were free from any defects.

On the morning of March 4, 1963, at 11:00 o'clock, a rainfall began in Marion County and adjacent counties which eventually caused the West Fork River to overflow its banks flooding the communities adjacent to the stream. At this time of the year, snow was still on the ground and the combination of rain and rising temperature resulted in the worst flood experienced on the West Fork River since the year 1888. At approximately 3:30 P.M., on March 4, the river began to rise slowly in the area of West Fork Towing's landing, however, the water remained clear and the current was not appreciably stronger, indicating that water was being expelled at the Grafton Dam on the Tygart River and backing up in the West Fork River. About this time, an inspection of the barges revealed nothing unusual, they, from all appearances, being securely moored to the deadheads on the shore. Between 3:30 P.M. and 9:00 P.M., the water level on the West Fork River rose slowly and the current became somewhat stronger, but neither the level of the water nor the strength of the current was appreciably different from that experienced during previous floods on the river. The evidence indicates that flooding was practically an annual occurrence on the West Fork River and that up until about 9:00 P.M. the condition of the river was not much different from its condition during floods on previous occasions. Between 9:00 P.M. and 12:00 midnight of March 4, however, the waters began to rise at a much faster rate and by 12:00 midnight the level of the river was rising at a rate of three feet an hour. Thus, between 9:00 P.M. and 12:00 midnight, it became apparent that this particular flood was going to be much worse than those previously experienced and that there might be some danger to the vessels in the water. Employees of West Fork Towing were at the landing from 6:00 P.M. of the 4th through the 5th of March in order to keep a watch on the equipment and to do whatever they could to protect them from damage, but as a result of the flooded condition of the river, it became impossible to go upon the barges to add more cables. During the late hours of the 4th and the early morning hours of the 5th, West Fork Towing employees con-

tinued to check the lines on the barges. Around 3:30 A.M., March 5, barges 211 and 212 broke loose from their moorings and went adrift upon the river. These two barges struck several empty barges also tied to the shore setting four more of West Fork Towing's barges loose on the river.

None of West Fork Towing's employees actually saw the barges break loose, but an inspection of the mooring cables showed that the lead cable on the bow of the forward barge was intact, indicating that the timberhead on that barge had pulled loose. The three remaining cables which had been tied to barges 211 and 212 were broken. The evidence indicates that timberheads of the type used on barges 211 and 212 had a tendency to break off under severe stress, and though the timberheads on 211 and 212 appeared capable of withstanding normal river conditions, inspection had shown that they were somewhat loose. The evidence supports a finding that the timberheads were in the described condition at the time the barges were turned over to West Fork Towing and that this condition was easily ascertainable by inspection.

## LAW OF BAILMENT—BURDEN OF PROOF

Broadly defined, "bailment" includes the delivery of personal property by one person to another for a specific purpose with a contract, express or implied, that the purpose shall be faithfully executed, and the property returned or duly accounted for, 8 Am.Jur.2d, Bailments, Section 2 (1963). Iron City having shown by the evidence a transfer of possession and control of the barges to West Fork Towing as an incident of a business transaction between the two parties, the existence of a bailment relationship is established, giving rise to certain rights and liabilities normally a part of such a bailor-bailee relationship. When a bailor-bailee relationship is entered into for the mutual benefit of the parties, as in the present case, the bailee is obligated to exercise ordinary care to protect the subject of the bailment from loss, damage or destruction. Such obligation requires the bailee to exercise the same degree of care that a man of ordinary prudence would exercise under similar circumstances. Orrell v. Wilmington Iron Works, Inc., 185 F.2d 181 (4th Cir. 1950). Failure to exercise that degree of care on the part of the bailee, directly and proximately resulting in a loss of the subject of the bailment, is negligence and gives rise to liability on the part of the bailee.

Negligence of the bailee proximately resulting in damage to or loss of the subject of the bailment is the fact upon which the bailor's right of recovery is based, and the burden of proof of such fact rests upon the bailor. Seaboard Sand & Gravel Corporation v. American Stevedores, Inc., 151 F.2d 846, 847 (2d Cir. 1945). However, the bailor by proving delivery of the subject of the bailment to the bailee in good condition and the failure or refusal of the bailee to return the property makes out a prima facia case of negligence, imposing upon the defendant-bailee the duty of "going forward" with evidence showing that he exercised ordinary care or that the loss was due to causes other than his failure to exercise such care. Orrell v. Wilmington Iron Works, Inc., supra, at 183. The defendant-bailee satisfies such burden by producing explanatory evidence tending to exonerate himself from fault. Having produced such evidence, the burden is then on the plaintiff-bailor to show that the negligence of the bailee contributed to the loss or injury. Thus, though the burden of "going forward" with the evidence may shift during the trial, if explanatory evidence is produced by the defendant-bailee the ultimate burden of proof or the "risk of nonpersuasion" rests upon the plaintiff-bailor. This shifting of the burden of "going forward" with the evidence is solely a procedural device and once rebuttal evidence has been offered by the defendant-bailee, the question of "going forward" is removed from the case leaving the ultimate burden of proving the bailee's negligence

with the plaintiff-bailor. Richmond Sand & Gravel Corporation v. Tidewater Const. Corporation, 170 F.2d 392 (4th Cir. 1948).

## ULTIMATE FINDINGS AND CONCLUSIONS

 In the instant case, Iron City has produced evidence showing delivery of the barges and failure of West Fork Towing to return the same, establishing a prima facia case of liability on the part of the latter. West Fork Towing has in turn produced evidence tending to exonerate it from fault, thus satisfying its burden of going forward with the evidence. As submitted to this Court, therefore, the plaintiff-bailor must sustain the burden of proving by a preponderance of the evidence that the negligence of the defendant-bailee directly and proximately resulted in the loss of the barges which were the subject of the bailment. This we find and conclude the plaintiff-bailor has failed to do.

 The crucial issues insofar as determining liability in this case are, of course, whether the defendant-bailee exercised ordinary prudence in caring for the barges under the circumstances as they existed at the time the barges went adrift, and if it failed to exercise such care, whether such failure was the direct and proximate cause of the loss suffered. An obvious cause of the loss was the great force exerted upon the barges by the unusually high waters of the West Fork River. However, the mere fact that some force of nature or "act of God" was a factor involved in the loss of the bailed property is not by itself sufficient to excuse a bailee from liability. Moran Transportation Corporation v. New York Trap. Rock Corporation, 194 F.Supp. 599 (S.D.N.Y.1961). Thus, if the natural occurrence could reasonably have been anticipated and precautions taken to avoid the injury or loss, liability will be imposed upon him whose responsibility it was to have taken such precautions and failed to do so. Standard Brands, Inc. v. Nippon Yusen Kaisha, 42 F.Supp. 43, 45 (D.C.Mass.1941). Otherwise stated, where a storm or other act of God concurs with the negligence of a responsible person in producing an injury the party guilty of such negligence will be held liable for the injurious consequences if the loss would not have occurred except for his failure to exercise care. Bushnell v. Telluride Power Co., 145 F.2d 950 (10th Cir. 1944). In the instant case, Iron City contends that the failure of West Fork Towing to anticipate and take precautions to avoid the danger from the high water constituted negligence on its part which concurred with the act of God to produce the loss. But the evidence shows that precautionary measures had been taken by West Fork Towing only two weeks prior to the time the barges were lost. At that time new and additional lines were placed on the barges and, though these precautions were taken against the possibility of ice on the river, it appears that the danger of loss from floating ice was much greater than that from high waters. Having thus secured the barges against the possibility of floating ice, a natural hazard which ordinarily exerted much greater pressures upon the barge lines than floods, the defendant could not reasonably have anticipated that the barges would not remain securely moored during the period of high waters. As events transpired, however, the water in the West Fork River unforeseeably reached a level higher than had been reached in the past seventy-five years and because of this fortuitous event the barges went adrift. Iron City contends that West Fork Towing should have anticipated the unusually high waters and taken the necessary precautions to avoid the danger. It could be said with equal logic that Iron City's representative should have anticipated the flood and warned Pitrolo of the danger when he visited the landing sometime prior thereto. Continual reference was made during the trial to reports of the Army Corps of Engineers and the Commerce Department which apparently were supposed to have given warnings of approaching high waters, although no reports from these

agencies were submitted in evidence, and any finding that a warning was issued from these government agencies would be mere speculation. See 34 A.L.R.2d 1249 and cases cited therein. From the evidence adduced at the trial it appears that, in fact, the advent of the unusually high waters was rather sudden and unexpected and that by the time it became apparent that the barges might be endangered it was impossible to add additional mooring lines without imperiling human lives. Based upon such circumstances, including (1) the precautions taken by West Fork Towing prior to the loss of the barges, (2) the abnormally high level of the flood waters, and (3) the suddenness of the onset of the high waters, we find and conclude that there was no dereliction of duty on the part of the West Fork Towing or its representatives proximately causing the loss of the two barges in question.

 It is possible, of course, that West Fork Towing could have secured its barges in such a manner as to afford protection against the most unlikely contingencies. That it was not required to do so in order to avoid a charge of negligence is aptly pointed out by the following language in the Restatement of the Law of Torts 2d, Section 302:

"ABNORMAL CONDITIONS OF NATURE. The actor is not required to anticipate or provide against conditions of nature or the operation of natural forces which are of so unusual a character that the burden of providing for them would be out of all proportion to the chance of their existence or operation and the risk of harm to others involved in their possible existence or operation. It is therefore not necessary that a particular operation of the natural force be unprecedented. The likelihood of its recurrence may be so slight that in the aggregate the burden of constantly providing against it would be out of all proportion great as compared with the magnitude of the risk involved in the possibility of its recurrence."

Having shown the loss to be the result of an abnormal or unusual operation of natural forces, the only remaining question is whether West Fork Towing knew or should have anticipated the magnitude of the danger and taken precautionary measures to avoid it. While the question is a close one, and not easily answered, the Court, taking into consideration the credibility of the witnesses, their interest in the case, their ability to know the things about which they testified, and the reasonableness of their testimony, concludes that neither West Fork Towing nor Pitrolo could have reasonably anticipated the magnitude of the danger presented by the rising waters, and accordingly finds that their conduct in that event was not negligent.

Having found that the loss of the barges was due to an abnormal operation of natural forces which could not have been reasonably foreseen and provided against by West Fork Towing or Pitrolo, the Court will not now speculate on whether or not the cables pulled loose from the barges or whether a timberhead on the barge gave way causing the two barges to go adrift. In either event, under the view we take of the case, West Fork Towing and Pitrolo are absolved of all negligence proximately resulting in the loss of barges 211 and 212.

## ON MOTION TO AMEND FINDINGS

This case having been tried to the Court and findings of fact and conclusions of law having been made adverse to the plaintiff, the plaintiff now moves the Court, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, to amend or make additional findings and render judgment against the defendants.

### SUPPLEMENTAL FINDINGS AND CONCLUSIONS

 After consideration of plaintiff's brief and a review of the evidence, the Court now reaffirms its original findings and conclusions and, accordingly, denies the motion, except insofar as it requests additional findings with respect to the individual liability of the

estate of Paul Pitrolo. As to this secondary issue, we did not reach it in our original findings and conclusions because we had found and concluded that the loss of the barges was due to an abnormal operation of natural forces rather than to negligence on the part of the defendants, and that, consequently, there could be no recovery. However, in anticipation that our original decision will be appealed and in order that the defendant Pitrolo may cross-appeal and the secondary issue be reviewed on a single appeal along with the other issues decided, we have reviewed the evidence and the law applicable thereto, and find and conclude that West Fork Towing Corporation was the "alter ego" of Paul Pitrolo, rendering him personally responsible for any liability that may be established against West Fork Towing Corporation.

Finding, as we do, that the "corporate veil" should be pierced, the Court is cognizant of the fact that such action should not be taken precipitately but only after a careful consideration of the facts of the particular case, Klein v. Board of Tax Supervisors, 282 U.S. 19, 51 S.Ct. 15, 75 L.Ed. 140 (1930), nevertheless, we think the facts in this case justify such a procedure. In reaching this conclusion, the Court has relied upon the following facts:

(1) Upon incorporation in 1957, and with an authorized capitalization of $50,000, the corporation issued ten shares of stock for a total consideration of $1,000. No other shares were ever issued and of the ten shares issued, Paul Pitrolo purchased eight of them.

(2) From the date of incorporation to the date of his death in 1966, Paul Pitrolo was the president, principal stockholder and general manager of West Fork Towing Corporation.

(3) Almost from its inception, West Fork Towing Corporation was insolvent, its funds being supplied by way of loans from Paul Pitrolo, individually, or through corporations principally owned by Paul Pitrolo.

(4) Other than an organizational meeting of directors in 1957, no stockholders' or directors' meetings of West Fork Towing Corporation were ever held.

The Court recognizes the principle that ownership of all or almost all of the shares of a corporation by one individual does not afford sufficient ground for disregarding the corporate entity, Ruberoid Co. v. North Texas Concrete Co., 193 F.2d 121 (5th Cir. 1951), nevertheless, where such ownership is combined with the other factors involved in this case, particularly the inadequate capitalization, see 63 A.L.R.2d 1951, we find little difficulty in holding that West Fork Towing Corporation was the "alter ego" of Paul Pitrolo. See Tynes v. Shore, 117 W.Va. 355, 185 S.E. 845 (1936); Long v. McGlon, 263 F.Supp. 96 (D.C.S.C. 1967); Brown v. Margrande Compania Naviera, 281 F.Supp. 1004 (E.D.Va. 1968). If this Court were to treat West Fork Towing Corporation as a separate legal entity it would be attributing to it a status which, according to the evidence, was never attributed to it by Paul Pitrolo. That this is the case is demonstrated by the fact that, insofar as the evidence shows, Paul Pitrolo made all the corporate decisions required of West Fork Towing Corporation, he loaned the corporation the money with which it purchased its operating equipment and he leased the corporation the land upon which it was operated. The offices of West Fork Towing Corporation were located in a building owned by a corporation controlled by Paul Pitrolo, in which another corporation owned by Pitrolo— Pitrolo Pontiac Company—was also located. While separate accounts were maintained for West Fork Towing Corporation, it appears that these accounts were prepared, at least part of the time, by employees of Pitrolo Pontiac Company in offices which West Fork Towing Corporation shared with Pitrolo Pontiac. Thus, in denying an independent status to West Fork Towing Corporation, the Court would only be recognizing the rule of law that when the corporate fic-

tion is a mere simulacrum, an alter ego or business conduit of an individual, it may be disregarded in the interest of securing a just determination of an action.

A factor which mitigates strongly against according separate entity treatment to West Fork Towing Corporation arises out of the fact that only a nominal amount of capital was invested in the corporation, for, as was pointed out by the Supreme Court, an obvious inadequacy of capital, "measured by the nature and magnitude of the corporate undertaking," is an important factor to be considered in deciding whether to deny stockholders their defense of limited liability. Anderson v. Abbott, 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944). In the instant case the $1,000 investment in stock resulted in the inevitable—that the corporation was from its inception an insolvent corporation with its liabilities, primarily notes payable to Paul Pitrolo, in excess of its assets. Where, as here, the capital has been shown to be inadequate when compared with the business to be done and the risks of loss, the Courts have been inclined to hold the owners of the corporation personally liable for the acts and obligations of the corporation. Such action by the Courts has been taken in cases involving both contractual debts and tort claims. Minton v. Cavaney, 56 Cal.2d 576, 15 Cal.Rptr. 641, 364 P.2d 473 (1961). See also Markow v. Alcock, 356 F.2d 194 (5th Cir. 1966); Francis O. Day Co. v. Shapiro, 105 U.S.App.D.C. 392, 267 F.2d 669 (1959); Stone v. Eacho, 127 F.2d 284 (4th Cir. 1942).

In order to disregard the corporate entity, it is not necessary that plaintiff prove actual fraud, but it will suffice if the "recognition of the two entities as separate would result in an injustice." Shamrock Oil and Gas Co. v. Ethridge, 159 F.Supp. 693 (D.C.Colorado, 1958). See also Gordon v. Aztec Brewing Co., 33 Cal.2d 514, 203 P.2d 522 (1949). Nor do we, by our opinion, attribute any fraud, attempted or perpetrated, to West Fork Towing Corporation, for the testimony clearly demon-

strates that plaintiff, in entering into the bailor-bailee relationship with West Fork Towing Corporation, contemplated a relationship between it and another corporation rather than a relationship with Paul Pitrolo as an individual. Nevertheless, in entering into such relationships with corporate entities the parties are entitled to rely upon certain assumptions, one being that the corporation is more than a mere shell—that it has substance as well as form. When, however, it results that a corporation is such only in name, the Courts will not leave the injured party remediless, but will disregard the corporate entity and place the responsibility for the actions of the corporation upon the individual who brought them about. In the present case, West Fork Towing Corporation being the "alter ego" of Paul Pitrolo, he must assume responsibility for any liability which may be found on the part of West Fork Towing Corporation.