440 F.2d 958
 IRON CITY SAND & GRAVEL DIVISION OF McDONOUGH COMPANY, a corporation, Appellant,
v.
The WEST FORK TOWING CORPORATION, a corporation, and Anthony J. Pitrolo, Administrator of the Estate of Paul Pitrolo, deceased, Appellees.
 No. 13673.
 United States Court of Appeals, Fourth Circuit.
 Argued March 3, 1970.
 Decided April 7, 1971.
 
 Raymond G. Hasley, Pittsburgh, Pa., (Rose, Schmidt & Dixon, Pittsburgh, Pa., Russell L. Furbee, and Furbee, Amos, Webb & Critchfield, Fairmount, W. Va., on brief) for appellant.
 George W. May, Fairmount, W. Va., for appellees.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF and BRYAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 In this proceeding in admiralty, damages were sought for the loss of two barges during a flood on the West Fork River in West Virginia. The District Judge exonerated their possessor, but, upon his findings and undisputed portions of the record, we conclude that entry of judgment in favor of the owner was requisite.
 
 
 2
 On February 8, 1963, West Fork Towing Corporation's tug, the Mike Murphy, took under tow two barges owned by Iron City Sand & Gravel Division of McDonough Co. This was at Iron City's docks on the Monongahela River in Pittsburgh. The barges were loaded with sand, and the purpose was to move the loaded barges to West Fork's docks on the West Fork River at Fairmont, West Virginia, where the sand was to be unloaded for West Fork's business purposes.
 
 
 3
 The Mike Murphy, with the two barges in tow, arrived safely at West Fork's dock, where the barges were tied up and where they remained until March 5, 1963 when they went adrift and foundered.
 
 
 4
 At the time the barges went adrift there was an unprecedented flood on the West Fork River. The District Court, 298 F.Supp. 1091, attributed the loss of the barges solely to the flood, concluding that West Fork had taken all reasonable precautions for their safety. The conclusion, however, is dependent upon one finding which is unsupported in this record and upon an assumption which the record contradicts.
 
 
 5
 While the testimony shows the flood in March 1963 was greater than any spring flood since 1888, spring flooding was an annual occurrence, and this one was specifically forecast in the weather reports. West Fork's president knew of the reports, but, as presently will be seen, nothing was done to extend extra protection to the barges until the flood had risen to such heights that West Fork's employees concluded that they could not safely put a man aboard them.
 
 
 6
 The testimony showed that, after arrival of the barges at West Fork's dock, they were lashed together, stern to bow, with a two-inch hemp rope. Two seven-eighth-inch steel cables were run from a timberhead at the bow of the first barge to a deadhead on the bank and two similar steel cables were employed to secure the stern of the second. The testimony was that four of such cables were sufficient to secure the two loaded barges under normal conditions.
 
 
 7
 The District Court's exoneration of West Fork was dependent upon a finding that two weeks before the flood additional lines had been run to the barges because of a threat of floating ice in the river. All of the witnesses agreed that additional lines should have been run in the face of a threat of ice or flooding, but if a sufficient number of additional lines had been run to meet the threat of floating ice and had remained in place, the threat of the flood may not have required even more lines to secure the still loaded barges. The difficulty, however, is that the deposition testimony about the running of additional lines to meet the threat of floating ice was not made a part of the record in this case, and, perhaps more importantly, the record positively shows that at the time of the flood the barges were secured with no more than the four lines which were placed upon their first arrival in February.
 
 
 8
 Mr. Pitrolo, West Fork's President, said, when his deposition was taken before trial in a companion case, that additional lines had been run to the barges two weeks before the flood because of the fear of floating ice. Pitrolo died before the trial, however, and, while some portions of his deposition were read into the record, that portion in which he referred to the additional lines which had been run to meet the threat of floating ice was not among them. The deposition was not offered in evidence. On this record, the finding that additional lines had been run at that time is technically unsupported. However, the record is quite clear that there were no more than four lines securing the two barges at the time of the flooding. That was the number by which they had initially been secured on first arrival at West Fork's dock in normal, calm conditions. What disagreement there is among the witnesses revolved around the question of whether there were four lines at the time of the flood or only three, and whether they were new cables or old. The District Judge found that there were four and that they were new, but all the witnesses who alluded to the matter were in agreement that the prediction of flood required additional precautions, particularly the running of additional lines to secure the barges.[1]
 
 
 9
 If in fact, additional lines had been run when the barges were threatened by floating ice, it would only reinforce the conclusion, which the record otherwise requires, that the four lines with which the barges were initially secured, while sufficient for normal conditions, were not enough for abnormal conditions. The record, however, clearly shows that such extra lines were not in place at the time of the flooding, and nothing was done to place such extra lines when the flood was predicted. Mr. Pitrolo knew of those predictions[2] and he knew that such a flood was an annual occurrence at that time of year, but he did nothing to have such additional lines placed during the period of eight hours or more before the river began to rise or even afterwards when the slowly rising waters were not tumultuous.[3] He did not even tell the pilot of his tug of the flood predictions, though the pilot testified that he would have taken additional measures to secure the barges if he had been informed of the weather report.[4]
 
 
 10
 The flood was an extraordinary one, but when West Fork took no precautions to secure the barges against reasonably expected flood conditions after specific warning that a flood was on the way, when it left the barges secured by moorings adequate only for normal conditions until the flood had risen to such heights that additional lines could not be placed without risk of life and the barges were cast adrift, it could not be held faultless.
 
 
 11
 The record required a finding of the owner's entitlement to recover the value of the barges.
 
 
 12
 The judgment is reversed and the case remanded for an assessment of the damages.
 
 
 13
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 We do not think the testimony of Hiernaux, Nichols and Hall, quoted in the dissenting opinion, fairly implies that four lines were sufficient for normal flood conditions. Hiernaux, the only expert, did state that four lines should have been sufficient for most conditions, but he expressly refused to extend that generalization to flood conditions. The pilot Nichols, of course, based his conclusion not on any assumption that the lines were sufficient for flood conditions but on the erroneous belief that no flooding was expected. Only Paul Hall stated that the barges seemed secure with four lines in noticeably rising waters. However, he disclaimed any expertise in the matter. His principal employment was in an adjacent junk yard owned by Pitrolo; before 1958 he had never worked near a river or with boats or barges, and he had no training or experience to qualify him for judging flood conditions. His employment involved no independent judgment, and he relied entirely on Pitrolo's instructions in performing duties around the landing. Only once on March 5 did he even see the barges, at 3:30 p. m. when he left the junk yard where he had been working all day
 
 
 [2]
 There had been heavy rain for two days. Accumulated snow was melting. Mr. Pitrolo testified that he received reports of actual flooding in upstream tributaries, and he heard the weather reports predicting flooding in the West Fork. He was aware of all of these things throughout the day preceding the night of the flood
 
 
 [3]
 For some hours after the flood began, the rate of the rise of the water was slow and the current was not strong. Later the rise became very rapid and the current swift
 
 
 [4]
 The pilot was recording the river's stages during the day preceding the flood, but, unaware of the weather predictions and the reports of flooding in up river tributaries, he mistakenly ascribed the rising water to the operation of a dam. Because of that mistake he did nothing
 
 
 SOBELOFF, Senior Circuit Judge (dissenting):
 
 14
 My colleagues and I are in accord that this case should be reversed. The opinion of the District Court distinctly evidences reliance on an affidavit filed in an earlier related case, but not made a part of the trial record in this case. Portions of the affidavit were read into evidence at trial, but one fact which the District Court relies upon is supported only by a portion of the affidavit which was not read into the record. Clearly the facts must be redetermined on the basis of the information actually placed in evidence at trial. I cannot agree, however, that the facts of this case are so clear that this court is entitled to enter judgment outright for Iron City rather than remanding to the District Court for a reassessment of the record.
 
 
 15
 The crux of the majority's position is that the number of lines securing the barges was not sufficient to protect against flood conditions. Quite properly they point out that the District Court erred in basing its contrary conclusion on a finding that extra lines had been run to the barges to protect against floating ice — it was this finding that was supported solely by evidence outside the record. Nevertheless, the record would support a conclusion that the four lines which were run to the barges were sufficient not only, as the majority suggests, to meet normal river conditions but to meet normal flood conditions. Furthermore, the record would sustain a finding that only normal spring flood conditions were expected and the barges were torn loose by an extreme flood that was not, and could not have been, anticipated until a time when the river had already risen too high to allow more lines to be run to the barges.
 
 
 16
 In concluding that the barges should have been secured by more than four lines, the majority states that "all the witnesses who alluded to the matter were in agreement that the prediction of flood required additional precautions, particularly the running of additional lines to secure the barges." This summary cannot be squared with the record. For example, Mr. Richard G. Hiernaux was called as an expert witness by West Fork, and Iron City stipulated to his qualifications as an expert in the river transportation business, in which he had worked for forty-four years. His firm operated a fleet of fifty barges, and he was sufficiently familiar with the type of barge involved in this dispute to testify also as an expert for valuation purposes. Mr. Hiernaux was familiar with the West Fork landing and with the river at that point, although he had not seen it at flood stage. That his opinion was contrary to the summary given by the majority is evidenced by this exchange:
 
 
 17
 Q. I ask you specifically, Mr. Hiernaux, if four 7/8 steel cables would ordinarily be enough to hold two loaded sand barges in most any condition?
 
 
 18
 A. I would say so, yes.
 
 
 19
 (Emphasis added.)
 
 
 20
 Another witness called by West Fork was Mr. Paul Hall, a West Fork employee of five years at the time of the accident. His duties included mooring and fastening up the barges and assisting in shifting them around in the course of loading and unloading.[1] Mr. Hall, who had had prior experience with flooding at the West Fork landing, was asked why he did not add more cables when he saw the water rising during the afternoon preceding the loss of the Iron City barges: "I thought the barges were secure there with those cables I had on." This testimony, like Mr. Hiernaux's, is hardly consistent with the statement that all witnesses agree that additional precautions should have been taken.
 
 
 21
 Merle W. Nichols, the pilot and captain of West Fork's tug at the time of the accident, had held that job for four years and had previously worked as a river pilot for two other firms. He testified that barges were always tied in preparation for high water: "You tie them so they stay there, that is what you're supposed to do, high water or low water." Moreover, he was present at the West Fork landing the evening of the flood and observed the condition of the barges at 11:00 p. m., just four or five hours before they broke loose. Asked whether there then appeared any danger of the barges tearing away, he replied that they "looked pretty well secure from where I could see it * * *."
 
 
 22
 Thus, we have three witnesses testifying directly that the four lines would have been quite sufficient precaution against the normal spring flood that was reasonably anticipated. Instead, it turned out to be, as the majority acknowledges, "greater than any spring flood since 1888."
 
 
 23
 The majority states that Nichols "testified that he would have taken additional measures to secure the barges if he had been informed of the weather report." On the contrary, Nichols testified that the barges were torn loose by a flash flood which could not have been known about beforehand. The testimony to which the majority apparently refers is Nichols' admission that if it had been possible to predict the flash flood, and if he had been forewarned, then he would have taken more precautions:
 
 
 24
 Q. If you had known that there was going to be any rise in the river you could have taken the "MIKE MURPHY" with lines up to those loaded barges and had them run over to the shore, isn't that correct?
 
 
 25
 A. If I had known, but I didn't know.
 
 
 26
 * * * * * *
 
 
 27
 Q. And the reason you didn't know is that Mr. Pitrolo didn't tell you, isn't that right, and you yourself didn't make any inquiry about what the weather conditions were going to be, isn't that right?
 
 
 28
 A. Mr. Pitrolo didn't have to do any checking about flash floods or running water. Mr. Pitrolo couldn't check it. That is what I stated a little while ago. Nobody could check a flash flood. (Emphasis added.)
 
 
 29
 Shortly thereafter Nichols was again asked about taking additional precautions:
 
 
 30
 Q. If you couldn't move the barges out to a more secure location, isn't it correct that if you had known or you had any idea that the water was going to rise the way it did, that the proper thing to do was to go up and put more lines on your loaded barges over to the shore, isn't that correct?
 
 
 31
 A. Well, if you know, yes. If you know.
 
 
 32
 (Emphasis added.)
 
 
 33
 These hypothetical questions and answers, when read in context, far from supporting the majority's ultimate conclusions, directly contradict them.
 
 
 34
 Concededly a district judge might reach the conclusion the majority has reached — that West Fork was negligent in its handling of Iron City's barges. But the case is, to my mind, a close one, and not one to be decided by the appellate court as a matter of law. Because I could not hold the trial judge clearly erroneous in concluding on the record before us that West Fork was not negligent, I would remand the case for the District Court's reconsideration.
 
 
 
 Notes:
 
 
 [1]
 The majority suggests that Mr. Hall's testimony is of little value because he was really employed in the junkyard, had little expertise in tying barges, and was not qualified to judge flood conditions. The record is unequivocally to the contrary. During Hall's five years of employment by West Fork he "tended to the mooring or fastening up of the barges" and "assisted in shifting them around as necessary." Moreover, he was theonly West Fork employee who worked around the barges. He also worked in the junkyard because the barge work did not occupy him full time. And during the period of his employment prior to the loss of the Iron City barges there had been flooding on the West Fork River "several times."